# CITY OF EASTLAKE ET AL. *v.* FOREST CITY ENTERPRISES, INC.

No. 74–1563.   Argued March 1, 1976—Decided June 21, 1976

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined. POWELL, J., filed a dissenting opinion, *post*, p. 680. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 680.

*J. Melvin Andrews* argued the cause and filed briefs for petitioners.

*William D. Ginn* argued the cause for respondent. With him on the brief were *Michael M. Hughes* and *Stephen L. Buescher.**

---

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Carl Boronkay,* Assistant Attorney General, and *Roderick Walston* and *Richard C. Jacobs,* Deputy Attorneys General, for the State of California; by *Barry M. Byron* for the city of Euclid, Ohio, et al.; and by *Robert R. Soltis* for the city of Garfield Heights, Ohio, et al.

Briefs of *amici curiae* urging affirmance were filed by *William J. Brown,* Attorney General, and *Earl M. Manz* and *David G. Latanick,* Assistant Attorneys General, for the State of Ohio; by *Richard F. Babcock, David L. Callies,* and *R. Marlin Smith* for the National

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question in this case is whether a city charter provision requiring proposed land use changes to be ratified by 55% of the votes cast violates the due process rights of a landowner who applies for a zoning change.

The city of Eastlake, Ohio, a suburb of Cleveland, has a comprehensive zoning plan codified in a municipal ordinance. Respondent, a real estate developer, acquired an eight-acre parcel of real estate in Eastlake zoned for "light industrial" uses at the time of purchase.

In May 1971, respondent applied to the City Planning Commission for a zoning change to permit construction of a multifamily, high-rise apartment building. The Planning Commission recommended the proposed change to the City Council, which under Eastlake's procedures could either accept or reject the Planning Commission's recommendation. Meanwhile, by popular vote, the voters of Eastlake amended the city charter to require that any changes in land use agreed to by the Council be approved by a 55% vote in a referendum.[1] The City

Association of Home Builders et al.; and by *Paul A. Peterson, James B. Mehalick,* and *Stephen J. Pollak* for the San Diego Building Contractors Assn. et al.

[1] As adopted by the voters, Art. VIII, § 3, of the Eastlake City Charter provides in pertinent part:

"That any change to the existing land uses or any change whatsoever to any ordinance . . . cannot be approved unless and until it shall have been submitted to the Planning Commission, for approval or disapproval. That in the event the city council should approve any of the preceding changes, or enactments, whether approved or disapproved by the Planning Commission it shall not be approved or passed by the declaration of an emergency, and it shall not be effective, but it shall be mandatory that the same be approved by a 55% favorable vote of all votes cast of the qualified electors of the City of Eastlake at the next regular municipal election, if one shall occur not less than sixty (60) or more than

Council approved the Planning Commission's recommendation for reclassification of respondent's property to permit the proposed project. Respondent then applied to the Planning Commission for "parking and yard" approval for the proposed building. The Commission rejected the application, on the ground that the City Council's rezoning action had not yet been submitted to the voters for ratification.

Respondent then filed an action in state court, seeking a judgment declaring the charter provision invalid as an unconstitutional delegation of legislative power to the people.[2] While the case was pending, the City Council's action was submitted to a referendum, but the proposed zoning change was not approved by the requisite 55% margin. Following the election, the Court of Common Pleas and the Ohio Court of Appeals sustained the charter provision.[3]

The Ohio Supreme Court reversed. 41 Ohio St. 2d 187, 324 N. E. 2d 740 (1975). Concluding that enactment of zoning and rezoning provisions is a legislative function, the court held that a popular referendum

one hundred and twenty (120) days after its passage, otherwise at a special election falling on the generally established day of the primary election. . . ."

[2] Respondent also contended that the charter amendment could not apply to its rezoning application since the application was pending at the time the amendment was adopted. The Court of Common Pleas rejected the argument. Respondent neither appealed this point nor argued it in the Court of Appeals or the Ohio Supreme Court; the issue is therefore not before us.

[3] The Court of Common Pleas, however, invalidated the charter provision requiring assessment of election costs against the affected property owner. In affirming, the Court of Appeals also upheld that portion of the trial court's judgment. No appeal was taken to the Ohio Supreme Court on this issue. The question was, accordingly, not passed on by the State Supreme Court, and is therefore not before us.

requirement, lacking standards to guide the decision of the voters, permitted the police power to be exercised in a standardless, hence arbitrary and capricious manner. Relying on this Court's decisions in *Washington ex rel. Seattle Trust Co.* v. *Roberge,* 278 U. S. 116 (1928), *Thomas Cusack Co.* v. *Chicago,* 242 U. S. 526 (1917), and *Eubank* v. *Richmond,* 226 U. S. 137 (1912), but distinguishing *James* v. *Valtierra,* 402 U. S. 137 (1971), the court concluded that the referendum provision constituted an unlawful delegation of legislative power.[4]

We reverse.

## I

The conclusion that Eastlake's procedure violates federal constitutional guarantees rests upon the proposition that a zoning referendum involves a delegation of legislative power. A referendum cannot, however, be characterized as a delegation of power. Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create. See, *e. g.,* The Federalist No. 39 (J. Madison). In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature. *Hunter* v. *Erickson,* 393 U. S. 385, 392 (1969).[5]

The reservation of such power is the basis for the

---

[4] Respondent did not challenge the 55%-affirmative requirement as such. Instead, respondent contended that any mandatory referendum provision, regardless of the requisite margin for approval, violated due process as applied to its rezoning application.

[5] The people of Ohio, in establishing the general assembly, provided:

"The legislative power of the state shall be vested in a General Assembly . . . but the people reserve to themselves the power to propose to the General Assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote . . . ." Ohio Const., Art. II, § 1.

town meeting, a tradition which continues to this day in some States as both a practical and symbolic part of our democratic processes.[6] The referendum, similarly, is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to "give citizens a voice on questions of public policy." *James* v. *Valtierra, supra,* at 141.

In framing a state constitution, the people of Ohio specifically reserved the power of referendum to the people of each municipality within the State.

> "The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action . . . ." Ohio Const., Art. II, § 1f.

To be subject to Ohio's referendum procedure, the question must be one within the scope of legislative power. The Ohio Supreme Court expressly found that the City Council's action in rezoning respondent's eight acres from light industrial to high-density residential use was legislative in nature.[7] Distinguishing between administrative and legislative acts, the court separated the power to zone or rezone, by passage or amendment of a

---

[6] In Massachusetts, for example, the inhabitants could convene a town meeting for the purpose of regulating nuisances. A. De Wolf, The Town Meeting: A Manual of Massachusetts Law 136 (1890). See generally Bryan, Town Meeting Government Still Supported in Vermont, 61 Nat. Civic R. 348 (1972).

[7] The land use change requested by respondent would likely entail the provision of additional city services, such as schools and police and fire protection. Cf. *James* v. *Valtierra,* 402 U. S. 137, 143 n. 4 (1971). The change would also diminish the land area available for industrial purposes, thereby affecting Eastlake's potential economic development.

zoning ordinance, from the power to grant relief from unnecessary hardship.[8] The former function was found to be legislative in nature.[9] Accord, *Denney* v. *Duluth,* 295 Minn. 22, 28–29, 202 N. W. 2d 892, 895–896 (1972); *Smith* v. *Township of Livingston,* 106 N. J. Super. 444, 454, 256 A. 2d 85, 90 (1969); *Wollen* v. *Borough of Fort Lee,* 27 N. J. 408, 422, 142 A. 2d 881, 888–889 (1958); *Johnston* v. *City of Claremont,* 49 Cal. 2d 826, 835–836, 323 P. 2d 71, 76–77 (1958); *Dwyer* v. *City Council,* 200 Cal. 505, 515, 253 P. 932, 935–936 (1927); *Hilltop Realty, Inc.* v. *City of South Euclid,* 110 Ohio App. 535, 164 N. E. 2d 180 (1960). Compare *Kelley* v. *John,* 162 Neb. 319, 75 N. W. 2d 713 (1956), with *In re Frank,* 183 Neb. 722, 723, 164 N. W. 2d 215, 216 (1969).

---

[8] By its nature, zoning "interferes" significantly with owners' uses of property. It is hornbook law that "[m]ere diminution of market value or interference with the property owner's personal plans and desires relative to his property is insufficient to invalidate a zoning ordinance or to entitle him to a variance or rezoning." 8 E. Mc-Quillan, Municipal Corporations § 25.44, p. 111 (3d ed., 1965). There is, of course, no contention in this case that the existing zoning classification renders respondent's property valueless or otherwise diminishes its value below the value when respondent acquired it.

[9] The power of initiative or referendum may be reserved or conferred "with respect to any matter, legislative or administrative, within the realm of local affairs . . . ." 5 E. McQuillan, Municipal Corporations § 16.54, p. 208 (3d ed., 1969). However, the Ohio Supreme Court concluded that only land use changes granted by the City Council when acting in a *legislative* capacity were subject to the referendum process. Under the court's binding interpretation of state law, a property owner seeking relief from unnecessary hardship occasioned by zoning restrictions would not be subject to Eastlake's referendum procedure. For example, if unforeseeable future changes give rise to hardship on the owner, the holding of the Ohio Supreme Court provides avenues of administrative relief not subject to the referendum process.

## II

The Ohio Supreme Court further concluded that the amendment to the city charter constituted a "delegation" of power violative of federal constitutional guarantees because the voters were given no standards to guide their decision. Under Eastlake's procedure, the Ohio Supreme Court reasoned, no mechanism existed, nor indeed could exist, to assure that the voters would act rationally in passing upon a proposed zoning change. This meant that "appropriate legislative action [would] be made dependent upon the potentially arbitrary and unreasonable whims of the voting public." 41 Ohio St. 2d, at 195, 324 N. E. 2d, at 746. The potential for arbitrariness in the process, the court concluded, violated due process.

Courts have frequently held in other contexts that a congressional delegation of power to a regulatory entity must be accompanied by discernible standards, so that the delegatee's action can be measured for its fidelity to the legislative will. See, e. g., *Yakus* v. *United States,* 321 U. S. 414 (1944); *Amalgamated Meat Cutters* v. *Connally,* 337 F. Supp. 737 (DC 1971). Cf. *FEA* v. *Algonquin SNG, ante,* p. 548. See generally 8 E. McQuillan, Municipal Corporations § 25.161, pp. 521–522 (3d ed. 1965); Note, 1972 Duke L. J. 122. Assuming, *arguendo,* their relevance to state governmental functions, these cases involved a delegation of power by the legislature to regulatory bodies, which are not directly responsible to the people; this doctrine is inapplicable where, as here, rather than dealing with a delegation of power, we deal with a power reserved by the people to themselves.[10]

---

[10] The Ohio Supreme Court's analysis of the requirements for standards flowing from the Fourteenth Amendment also sweeps too broadly. Except as a legislative history informs an analysis

In basing its claim on federal due process requirements, respondent also invokes *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926), but it does not rely on the direct teaching of that case. Under *Euclid*, a property owner can challenge a zoning restriction if the measure is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Id.*, at 395. If the substantive result of the referendum is arbitrary and capricious, bearing no relation to the police power, then the fact that the voters of Eastlake wish it so would not save the restriction. As this Court held in invalidating a charter amendment enacted by referendum:

> "The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Hunter* v. *Erickson*, 393 U. S., at 392.

See also *Lucas* v. *Colorado Gen. Assembly*, 377 U. S. 713, 736–737 (1964); *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U. S. 624, 638 (1943).

But no challenge of the sort contemplated in *Euclid* v. *Ambler Realty* is before us. The Ohio Supreme Court did not hold, and respondent does not argue, that the present zoning classification under Eastlake's comprehen-

---

of legislative action, there is no more advance assurance that a legislative body will act by conscientiously applying consistent standards than there is with respect to voters. For example, there is no certainty that the City Council in this case would act on the basis of "standards" explicit or otherwise in Eastlake's comprehensive zoning ordinance. Nor is there any assurance that townspeople assembling in a town meeting, as the people of Eastlake could do, *Hunter* v. *Erickson*, 393 U. S. 385, 392 (1969), will act according to consistent standards. The critical constitutional inquiry, rather, is whether the zoning restriction produces arbitrary or capricious results.

sive ordinance violates the principles established in
*Euclid* v. *Ambler Realty.* If respondent considers the
referendum result itself to be unreasonable, the zoning
restriction is open to challenge in state court, where the
scope of the state remedy available to respondent would
be determined as a matter of state law, as well as under
Fourteenth Amendment standards. That being so,
nothing more is required by the Constitution.[11]

Nothing in our cases is inconsistent with this conclu-
sion. Two decisions of this Court were relied on by the
Ohio Supreme Court in invalidating Eastlake's procedure.
The thread common to both decisions is the delegation of
legislative power, originally given by the people to a leg-
islative body, and in turn delegated by the legislature to
a *narrow segment* of the community, not to the people
at large. In *Eubank* v. *Richmond,* 226 U. S. 137
(1912), the Court invalidated a city ordinance which
conferred the power to establish building setback lines
upon the owners of two-thirds of the property abutting
any street. Similarly, in *Washington ex rel. Seattle
Title Trust Co.* v. *Roberge,* 278 U. S. 116 (1928), the
Court struck down an ordinance which permitted the
establishment of philanthropic homes for the aged in
residential areas, but only upon the written consent of
the owners of two-thirds of the property within 400 feet
of the proposed facility.[12]

---

[11] The Supreme Court of Ohio rested its decision solely on the
Due Process Clause of the Fourteenth Amendment. See 41 Ohio
St. 2d 187, 196, 324 N. E. 2d 740, 746 (1975). The only ques-
tions presented to this Court in the petition for certiorari con-
cern the validity of that due process holding. Pet. for Cert. 2.
Accordingly, we confine ourselves to considering whether due
process is denied by the challenged charter amendment.

[12] The Ohio Supreme Court also considered this Court's decision in
*Thomas Cusack Co.* v. *Chicago,* 242 U. S. 526 (1917). In contrast
to *Eubank* and *Roberge,* the *Cusack* Court *upheld* a neighborhood

Neither *Eubank* nor *Roberge* involved a referendum procedure such as we have in this case; the standardless delegation of power to a limited group of property owners condemned by the Court in *Eubank* and *Roberge* is not to be equated with decisionmaking by the people through the referendum process. The Court of Appeals for the Ninth Circuit put it this way:

"A referendum, however, is far more than an expression of ambiguously founded neighborhood preference. It is the city itself legislating through its voters—an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest." *Southern Alameda Spanish Speaking Organization* v. *Union City, California,* 424 F. 2d 291, 294 (1970).

Our decision in *James* v. *Valtierra,* upholding California's mandatory referendum requirement, confirms this view. Mr. Justice Black, speaking for the Court in that case, said:

"This procedure ensures that *all the people* of a community will have a voice in a decision which may lead to large expenditures of local governmental

consent provision which permitted property owners to waive a municipal restriction prohibiting the construction of billboards. This Court in *Cusack* distinguished *Eubank* in the following way:

"[The ordinance in *Eubank*] left the establishment of the building line untouched until the lot owners should act and then . . . gave to it the effect of law. The ordinance in the case at bar absolutely prohibits the erection of any billboards . . . but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification." 242 U. S., at 531.

Since the property owners could simply waive an otherwise applicable legislative limitation, the Court in *Cusack* determined that the provision did not delegate legislative power at all. *Ibid.*

funds for increased public services . . . ." 402 U. S., at 143 (emphasis added).

Mr. Justice Black went on to say that a referendum procedure, such as the one at issue here, is a classic demonstration of "devotion to democracy . . . ." *Id.*, at 141. As a basic instrument of democratic government, the referendum process does not, in itself, violate the Due Process Clause of the Fourteenth Amendment when applied to a rezoning ordinance.[13] Since the rezoning decision in this case was properly reserved to the people of Eastlake under the Ohio Constitution, the Ohio Supreme Court erred in holding invalid, on federal constitutional grounds, the charter amendment permitting the voters to decide whether the zoned use of respondent's property could be altered.

The judgment of the Ohio Supreme Court is reversed,

---

[13] The fears expressed in dissent rest on the proposition that the procedure at issue here is "fundamentally unfair" to landowners; this fails to take into account the mechanisms for relief potentially available to property owners whose desired land use changes are rejected by the voters. First, if hardship is occasioned by zoning restrictions, *administrative* relief is potentially available. Indeed, the very purpose of "variances" allowed by zoning officials is to avoid "practical difficulties and unnecessary hardship." 8 E. McQuillan, Municipal Corporations § 25.159, p. 511 (3d ed. 1965). As we noted, *supra*, at 677, remedies remain available under the Ohio Supreme Court's holding and provide a means to challenge unreasonable or arbitrary action. *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926).

The situation presented in this case is not one of a zoning action denigrating the use or depreciating the value of land; instead, it involves an effort to *change* a reasonable zoning restriction. No existing rights are being impaired; new use rights are being sought from the City Council. Thus, this case involves an owner's seeking approval of a new use free from the restrictions attached to the land when it was acquired.

and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE POWELL, dissenting.

There can be no doubt as to the propriety and legality of submitting generally applicable legislative questions, including zoning provisions, to a popular referendum. But here the only issue concerned the status of a single small parcel owned by a single "person." This procedure, affording no realistic opportunity for the affected person to be heard, even by the electorate, is fundamentally unfair. The "spot" referendum technique appears to open disquieting opportunities for local government bodies to bypass normal protective procedures for resolving issues affecting individual rights.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, dissenting.

The city's reliance on the town meeting process of decisionmaking tends to obfuscate the two critical issues in this case. These issues are (1) whether the procedure which a city employs in deciding to grant or to deny a property owner's request for a change in the zoning of his property must comply with the Due Process Clause of the Fourteenth Amendment; and (2) if so, whether the procedure employed by the city of Eastlake is fundamentally fair?

## I

We might rule in favor of the city on the theory that the referendum requirement did not deprive respondent of any interest in property and therefore the Due Process Clause is wholly inapplicable.[1] After all, when respond-

---

[1] The Fourteenth Amendment provides: "No State shall . . . deprive any person of . . . property, without due process of law . . . ." U. S. Const., Amdt. 14, § 1.

ent bought this parcel, it was zoned for light industrial use and it still retains that classification. The Court does not adopt any such rationale; nor, indeed, does the city even advance that argument. On the contrary, throughout this litigation everyone has assumed, without discussing the problem, that the Due Process Clause does apply. Both reason and authority support that assumption.[2]

Subject to limitations imposed by the common law of nuisance and zoning restrictions, the owner of real property has the right to develop his land to his own economic advantage. As land continues to become more scarce, and as land use planning constantly becomes more sophisticated, the needs and the opportunities for unforeseen uses of specific parcels of real estate continually increase. For that reason, no matter how comprehensive a zoning plan may be, it regularly contains some mechanism for granting variances, amendments, or exemptions for specific uses of specific pieces of property.[3] No re-

---

[2] The Ohio Supreme Court opinion is reported at 41 Ohio St. 2d 187, 324 N. E. 2d 740 (1975).

[3] "Zoning maps are constantly being changed, for various reasons; and the question is, under what circumstances are such changes justified? . . . The problem is then to develop criteria for distinguishing valid from invalid zoning changes . . . ." 1 N. Williams, American Land Planning Law 6 (1974).

"Legally, all zoning enabling acts contemplate the possibility of dezoning, the power to amend zoning ordinances serving that purpose. The provisions do not show on their face whether they are intended to remedy particular errors or hardships, or whether they contemplate readjustments called for by the changing character of neighborhoods; undoubtedly, however, they may be made available for either purpose." Freund, Some Inadequately Discussed Problems of the Law of City Planning and Zoning, 24 Ill. L. Rev. 135, 145 (1929).

"For most communities, zoning as long range planning based on generalized legislative facts without regard to the individual facts has proved to be a theoretician's dream, soon dissolved in a

sponsibly prepared plan could wholly deny the need for presently unforeseeable future change.[4]

A zoning code is unlike other legislation affecting the use of property. The deprivation caused by a zoning code is customarily qualified by recognizing the property owner's right to apply for an amendment or variance to accommodate his individual needs. The expectancy that particular changes consistent with the basic zoning plan will be allowed frequently and on their merits is a normal incident of property ownership. When the governing body offers the owner the opportunity to seek such a change—whether that opportunity is denominated a privilege or a right—it is affording protection to the owner's interest in making legitimate use of his property.

The fact that an individual owner (like any other petitioner or plaintiff) may not have a legal right to the relief he seeks does not mean that he has no right to fair procedure in the consideration of the merits of his application. The fact that codes regularly provide a procedure for granting individual exceptions or changes, the fact that such changes are granted in individual cases with great frequency, and the fact that the particular code in the record before us contemplates that changes consistent with the basic plan will be allowed, all sup-

---

series of zoning map amendments, exceptions and variances—reflecting, generally, decisions made on individual grounds—brought about by unanticipated and often unforeseeable events: social and political changes, ecological necessity, location and availability of roads and utilities, economic facts (especially costs of construction and financing), governmental needs, and, as important as any, market and consumer choice." *Kropf* v. *City of Sterling Heights,* 391 Mich. 139, 168, 215 N. W. 2d 179, 191–192 (1974).

[4] "Zoning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future." *National Land & Investment Co.* v. *Easttown Township Bd. of Adjustment,* 419 Pa. 504, 528, 215 A. 2d 597, 610 (1965).

port my opinion that the opportunity to apply for an amendment is an aspect of property ownership protected by the Due Process Clause of the Fourteenth Amendment.

This conclusion is supported by the few cases in this Court which have decided zoning questions, and by many well-reasoned state-court decisions. In both *Eubank* v. *City of Richmond,* 226 U. S. 137, and *Washington ex rel. Seattle Title Trust Co.* v. *Roberge,* 278 U. S. 116, the Court invalidated ordinances for procedural reasons. In *Eubank* the Court held that the method of imposing a building-line restriction on a property owner was defective. In *Roberge,* which is more analogous to this case, the Court invalidated the requirement that the owners of two-thirds of the property within 400 feet must give their approval to the plaintiff's proposed use of his property. Implicitly, both cases hold that the process of making decisions affecting the use of particular pieces of property must meet constitutional standards.[5]

Although this Court has decided only a handful of zoning cases, literally thousands of zoning disputes have been resolved by state courts. Those courts have repeatedly identified the obvious difference between the adoption of a comprehensive citywide plan by legislative action and the decision of particular issues involving specific uses of specific parcels. In the former situation there is generally great deference to the judgment of the

---

[5] The majority distinguished these cases on the ground that "the standardless delegation of power to a limited group of property owners . . . is not to be equated with decisionmaking by the people through the referendum process." *Ante,* at 678. Whether or not that is a sufficient distinction of those cases insofar as they deal with the adequacy of the city's procedure, the distinction does not undermine their support for the proposition that the city's procedure must afford the property owner due process.

legislature; in the latter situation state courts have not hesitated to correct manifest injustice.

The distinction was plainly drawn by the Supreme Court of Oregon:

> "Ordinances laying down general policies without regard to a specific piece of property are usually an exercise of legislative authority, are subject to limited review, and may only be attacked upon constitutional grounds for an arbitrary abuse of authority. On the other hand, a determination whether the permissible use of a specific piece of property should be changed is usually an exercise of judicial authority and its propriety is subject to an altogether different test." *Fasano* v. *Board of County Comm'rs*, 264 Ore. 574, 580–581, 507 P. 2d 23, 26 (1973).

And the Supreme Court of Washington made the point in this way:

> "Zoning decisions may be either administrative or legislative depending upon the nature of the act. But, whatever their nature or the importance of their categorization for other purposes, zoning decisions which deal with an amendment of the code or reclassification of land thereunder must be arrived at fairly. The process by which they are made, subsequent to the adoption of a comprehensive plan and a zoning code, is basically adjudicatory.

> "Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of pub-

lic policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally." *Fleming* v. *City of Tacoma,* 81 Wash. 2d 292, 298–299, 502 P. 2d 327, 331 (1972) (citations omitted).[6]

Specialists in the practice of zoning law are unhappily familiar with the potential for abuse which exists when inadequate procedural safeguards apply to the dispensation of special grants. The power to deny arbitrarily may give rise to the power to exact intolerable conditions.[7] The insistence on fair procedure in this area

---

[6] *Fleming* was followed by the Supreme Court of Colorado:

"Although our early decisions viewed the enactment of *rezoning* ordinances as a legislative function, the more recent decisions have held such activity to be a quasi-judicial function and reviewable under Rule 106 (a)(4). In so doing, we have distinguished between the adjudicative process involved in enacting a *rezoning* ordinance and the legislative process involved in passing the general zoning ordinance. This distinction was concisely drawn by the Supreme Court of Washington in *Fleming* v. *Tacoma*, 81 Wash. 2d 292, 502 P. 2d 327 (1972)." *Snyder* v. *City of Lakewood,* —— Colo. ——, 542 P. 2d 371, 373–374 (1975) (footnotes omitted).

[7] One expert on zoning matters has made the following comment:

"The freedom from accountability of the municipal governing body may be tolerable in those cases where the legislature is engaged in legislating but it makes no sense where the legislature is dispensing or refusing to dispense special grants. When the local legislature acts to pass general laws applicable generally it is performing its traditional role and it is entitled to be free from those strictures we place upon an agency that is charged with granting or denying special privileges to particular persons. When the municipal legislature crosses over into the role of hearing and passing on individual petitions in adversary proceedings it should be required to meet the same procedural standards we expect from a traditional administrative agency." R. Babcock, The Zoning Game 158 (1966). Compare this comment with the practice of another "zoning man." See *United States* v. *Staszcuk,* 517 F. 2d 53, 56 (CA7 1975).

of the law falls squarely within the purpose of the Due Process Clause of the Fourteenth Amendment.

## II

When we examine a state procedure for the purpose of deciding whether it comports with the constitutional standard of due process, the fact that a State may give it a "legislative" label should not save an otherwise invalid procedure. We should, however, give some deference to the conclusion of the highest court of the State that the procedure represents an arbitrary and unreasonable way of handling a local problem.

In this case, the Ohio courts arrived at the conclusion that Art. VIII, § 3, of the charter of the city of Eastlake, as amended on November 2, 1971, is wholly invalid in three stages.[8] At no stage of the case has

---

[8] This exceptional bit of legislation is worth reading in its entirety:

"SECTION 3. MANDATORY REFERRAL

"That any change to the existing land uses or any change whatsoever to any ordinance, or the enactment of any ordinance referring to other regulations controlling the development of land and the selling or leasing or rental of parkways, playgrounds, or other city lands or real property, or for the widening, narrowing, re-locating, vacating, or changing the use of any public street, avenue, boulevard, or alley cannot be approved unless and until it shall have been submitted to the Planning Commission, for approval or disapproval. That in the event the city council should approve any of the preceding changes, or enactments, whether . . . approved or disapproved by the Planning Commission it shall not be approved or passed by the declaration of an emergency, and it shall not be effective, but it shall be mandatory that the same be approved by a 55% favorable vote of all votes cast of the qualified electors of the City of Eastlake at the next regular municipal election, if one shall occur not less than sixty (60) or more than one hundred and twenty (120) days after its passage, otherwise at a special election falling on the generally established day of the primary election. Said issue shall be submitted to the electors of the City only after approval of a

there been any suggestion that respondent's proposed use of its property would be inconsistent with the city's basic zoning plan,[9] or would have any impact on the

change of an existing land use by the Council for an applicant, and the applicant agrees to assume all costs of the election and post bond with the city Auditor in an amount estimated by the County Auditor or the Board of Elections proportionate with any other issues that may be on the ballot at the same time. The applicant shall further agree to authorize the City Auditor to advertise, and assume the obligations to pay, for a notice of the posted bond and the requested land use change in a newspaper of general circulation, whose circulation is either the largest, or second to the largest within the limits of the City for two consecutive times, with at least two weeks between notices and a third notice one week prior to the election. Should the land use request not be affirmed by a 55% favorable vote it cannot be presented again for one full year and a new request must be made at that time.

"It shall be the duty of any applicant for a land use change to obtain zoning codes, maps, thoroughfare and sewer plans or advice of the city council and officials and approving bodies for interpretation of this section as they are always available. If this section is violated and a building is under construction or completely constructed it shall be mandatory for the Mayor, Safety Director, Service Director and Building Inspector equally to have the building or structure removed completely within 60 days at the owner[']s expense as these officials are charged with the enforcement of this section. It shall be mandatory that the City Council charge and fund the Planning Commission to have on display at all times in the council chambers and available to the public a zone map, showing a legend and summary of zoning regulations by district, [m]ajor use, [m]inimum and maximum lot width and that each district, city park, playground, and city lands be accurately located and identified with the date of adoption and the date of revisions to date. Any and all revisions will be posted to the zone map within 90 days of their occurrence. Maps shall be available to each land owner of the city for a nominal cost not to exceed $2.50 each on demand. Maps shall be available within six months of this charter change."

[9] Both the City Planning Commission and the City Council expressly approved the proposal.

municipal budget or adversely affect the city's potential economic development.[10]

First, the requirement that the property owner pay the cost of the special election was invalidated in the trial court and in the Ohio Court of Appeals.[11] Second, the Ohio Supreme Court held that the mandatory referendum was "clearly invalid" insofar as it purported to apply to a change in land use approved by the City Council "in an administrative capacity." Without explaining when the Council's action is properly characterized as legislative instead of administrative, the court then held that even though its approval in this case was legislative, the entire referendum requirement was invalid. The court reasoned:

> "Due process of law requires that procedures for the exercise of municipal power be structured such that fundamental choices among competing municipal policies are resolved by a responsible organ of government. It also requires that a municipality protect individuals against the arbitrary exercise of municipal power, by assuring that fundamental policy choices underlying the exercise of that power are articulated by some responsible organ of municipal

----

[10] There is no support in the record for the speculation in the Court's opinion, *ante*, at 673 n. 7, that the land use change "would likely entail the provision of additional city services, such as schools and police and fire protection." It seems equally likely that the residents of Eastlake who might move into the new development would also receive such services if they lived elsewhere. Nor is there any support for the speculation that the "change would also diminish the land area available for industrial purposes, thereby affecting Eastlake's potential economic development." If that speculation were accurate, it is surprising that the Planning Commission and the Council approved the change.

[11] Indeed, the city never even tried to enforce that requirement; for when respondent refused to post the bond to cover the cost, the city went ahead and held the election anyway.

government. *McGautha* v. *California* (1971), 402 U. S. 183, 256, 270. The Eastlake charter provision ignored these concepts and blatantly delegated legislative authority, with no assurance that the result reached thereby would be reasonable or rational. For these reasons, the provision clearly violates the due process clause of the Fourteenth Amendment." 41 Ohio St. 2d 187, 196, 324 N. E. 2d 740, 746 (1975) (footnote omitted).

The concurring opinion expressed additional reasons for regarding the referendum requirement as arbitrary. Speaking for four members of the Ohio Supreme Court, Justice Stern stated:

"There can be little doubt of the true purpose of Eastlake's charter provision—it is to obstruct change in land use, by rendering such change so burdensome as to be prohibitive. The charter provision was apparently adopted specifically, to prevent multi-family housing, and indeed was adopted while Forest City's application for rezoning to permit a multi-family housing project was pending before the City Planning Commission and City Council. The restrictive purpose of the provision is crudely apparent on its face. Any zoning change, regardless of how minor, and regardless of its approval by the Planning Commission and the City Council, must be approved by a city-wide referendum. The proposed change must receive, rather than a simple majority, at least a 55 percent affirmative vote. Finally, the owner of the property affected is required to pay the cost of the election, although the provision gives no hint as to exactly which costs would be billed to a property owner.

"There is no subtlety to this; it is simply an attempt to render change difficult and expensive under the guise of popular democracy.

"Even stripped of its harsher provisions the charter provision poses serious problems. A mandatory, city-wide referendum which applies to any zoning change must, of necessity, submit decisions that affect one person's use of his property to thousands of voters with no interest whatever in that property. We need only imagine the adoption of this same provision in a city such as Cleveland. By such a provision, rezoning for a corner gasoline station would require the approval of hundreds of thousands of voters, most of them living miles away, and few of them with the slightest interest in the matter. This would be government by caprice, and would seriously dilute the right of private ownership of property. The law recognizes that the use a person makes of his property must inevitably affect his neighbors and, in some cases, the surrounding community. These real interests are entitled to be balanced against the rights of a property owner; but a law which requires a property owner, who proposes a wholly benign use of his property, to obtain the assent of thousands of persons with no such interest, goes beyond any reasonable public purpose." *Id.,* at 199–200, 324 N. E. 2d, at 748–749.

As the Justices of the Ohio Supreme Court recognized, we are concerned with the fairness of a provision for determining the right to make a particular use of a particular parcel of land. In such cases, the state courts have frequently described the capricious character of a decision supported by majority sentiment rather than reference to articulable standards.[12] Moreover, they have limited

---

[12] "But in restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of

statutory referendum procedures to apply only to approvals of comprehensive zoning ordinances as opposed to amendments affecting specific parcels.[13] This conclusion has been supported by characterizing particular amendments as "administrative" and revision of an entire plan as "legislative." [14]

---

neighbors or for their benefit. . . ." *Benner* v. *Tribbitt,* 190 Md. 6, 20, 57 A. 2d 346, 353 (1948).

"The determination of a petition for a variance cannot be determined by a poll of the sentiment of the neighborhood." *Town of Homecroft* v. *Macbeth,* 238 Ind. 57, 62–63, 148 N. E. 2d 563, 566 (1958).

"It is also not a proper exercise of such authority to base their decision [on a rezoning] merely on 'strenuous objections of residents of the Town' as [the Board] does in reason (3). Such remonstrances may be heard and taken into consideration but they may not be permitted to control the board's decision. *Heffernan* v. *Zoning Board,* 50 R. I. 26, 144 A. 674. A poll of the neighborhood to weigh the conflicting wishes of the residents or landowners in the vicinity is not the purpose of the hearing." *Kent* v. *Zoning Board of Town of Barrington,* 74 R. I. 89, 92, 58 A. 2d 623, 624 (1948).

"*Rather, the comprehensive plan is the essence of zoning.* Without it, there can be no rational allocation of land use. It is the insurance that the public welfare is being served and that zoning does not become nothing more than just a Gallup poll." (Emphasis added.) *Udell* v. *Haas,* 21 N. Y. 2d 463, 469, 235 N. E. 2d 897, 900–901 (1968).

[13] "While the referendum provision of the statute has not heretofore been construed by this court, we believe that the reasonable and proper construction of the statute supports the position of the plaintiff to the effect that the referendum-election provision applies only to a comprehensive type of zoning ordinance and does not apply to an altering or amending ordinance." *Minneapolis-Honeywell Regulator Co.* v. *Nadasdy,* 247 Minn. 159, 165, 76 N. W. 2d 670, 675 (1956).

[14] "The issue is whether an amendment to a city zoning ordinance changing the zoning of particular property is subject to a referendary vote of the electors of the city.

"We hold that such a change in zoning is not subject to referen-

In this case the Ohio Supreme Court characterized the Council's approval of respondent's proposal as "legislative." I think many state courts would have characterized it as "administrative." The courts thus may well differ in their selection of the label to apply to this action, but I find substantial agreement among state tribunals on the proposition that requiring a citywide referendum for approval of a particular proposal like this is manifestly unreasonable. Surely that is my view.

The essence of fair procedure is that the interested parties be given a reasonable opportunity to have their

---

dum. The right of referendum extends only to legislative acts. A change in the zoning of particular property, although in form (amendment of a zoning ordinance) and in traditional analysis thought to be legislative action, is in substance an administrative, not legislative, act." *West* v. *City of Portage,* 392 Mich. 458, 460–461, 221 N. W. 2d 303, 304 (1974).

"An ordinance changing the classification of property from residential to business use after the adoption of a comprehensive zoning plan is an administrative or executive matter, and not subject to referendum laws applicable to municipalities." *Kelley* v. *John,* 162 Neb. 319, 75 N. W. 2d 713, 714 (1956) (syllabus by the court).

"The City of Washington Terrace has in effect a master zoning plan ordinance. Subsequent to its adoption, the City Council passed an ordinance changing the classification of certain property from residential to commercial use. . . .

"The ordinance in question was passed after the requested change had been studied and recommended by the planning commission and after a public hearing had been held. The determinative question is whether or not the action of the City Council *was administrative or legislative. If the former, it is not subject to referendum.* We so hold, based upon logic and prior decisions of this court. *If each change in a zoning classification were to be submitted to a vote of the city electors, any master plan would be rendered inoperative. Such changes are administrative acts implementing the comprehensive plan and adjusting it to current conditions."* (Emphasis added.) *Bird* v. *Sorenson,* 16 Utah 2d 1–2, 394 P. 2d 808 (1964).

dispute resolved on the merits by reference to articulable rules. If a dispute involves only the conflicting rights of private litigants, it is elementary that the decision-maker must be impartial and qualified to understand and to apply the controlling rules.

I have no doubt about the validity of the initiative or the referendum as an appropriate method of deciding questions of community policy.[15] I think it is equally clear that the popular vote is not an acceptable method of adjudicating the rights of individual litigants. The problem presented by this case is unique, because it may involve a three-sided controversy, in which there is at least potential conflict between the rights of the property owner and the rights of his neighbors, and also potential conflict with the public interest in preserving the city's basic zoning plan. If the latter aspect of the controversy were predominant, the referendum would be an acceptable procedure. On the other hand, when the record indicates without contradiction that there is no threat to the general public interest in preserving the city's plan—as it does in this case, since respondent's proposal was approved by both the Planning Commission and the City Council and there has been no allegation that the use of this eight-acre parcel for apartments rather than light industry would adversely affect the community or raise any policy issue of citywide concern—I think the case should be treated as one in which it is essential that the private property owner be given

---

[15] *James* v. *Valtierra,* 402 U. S. 137, sustained the "use of referendums to give citizens a voice on questions of public policy." *Id.,* at 141. The approval of a publicly financed housing project, which might "lead to large expenditures of local governmental funds for increased public services and to lower tax revenues," *id.,* at 143, raises policy questions not involved in a zoning change for a private property owner. That case presented no due process or other procedural issue.

a fair opportunity to have his claim determined on its merits.

As Justice Stern points out in his concurring opinion, it would be absurd to use a referendum to decide whether a gasoline station could be operated on a particular corner in the city of Cleveland. The case before us is not that clear because we are told that there are only 20,000 people in the city of Eastlake. Conceivably, an eight-acre development could be sufficiently dramatic to arouse the legitimate interest of the entire community; it is also conceivable that most of the voters would be indifferent and uninformed about the wisdom of building apartments rather than a warehouse or factory on these eight acres. The record is silent on which of these alternatives is the more probable. Since the ordinance places a manifestly unreasonable obstacle in the path of every property owner seeking any zoning change, since it provides no standards or procedures for exempting particular parcels or claims from the referendum requirement, and since the record contains no justification for the use of the procedure in this case, I am persuaded that we should respect the state judiciary's appraisal of the fundamental fairness of this decisionmaking process in this case.[16]

---

[16] The final footnote in the Court's opinion identifies two reasons why the referendum procedure is not fundamentally unfair. Both reasons are consistent with my assumption that there is virtually no possibility that an individual property owner could be expected to have his application for a proposed land use change decided on the merits.

The first of the Court's reasons is that if "hardship" is shown, "*administrative* relief is potentially available"; that "potential" relief, however, applies only to some undefined class of claims that does not include this respondent's. A procedure in one case does not become constitutionally sufficient because some other procedure might be available in some other case.

The second of the Court's reasons is that there is a judicial

I therefore conclude that the Ohio Supreme Court correctly held that Art. VIII, § 3, of the Eastlake charter violates the Due Process Clause of the Fourteenth Amendment, and that its judgment should be affirmed.

---

remedy available if the zoning ordinance is so arbitrary that it is invalid on substantive due process grounds. This reason is also inapplicable to this case. There is no claim that the city's zoning plan is arbitrary or unconstitutional, even as applied to respondent's parcel. But if there is a constitutional right to fundamental fairness in the procedure applicable to an ordinary request for an amendment to the zoning applicable to an individual parcel, that right is not vindicated by the opportunity to make a substantive due process attack on the ordinance itself.