450 So.2d 1174 (1984)
Roger D. GAINES, Appellant,
v.
The CITY OF ORLANDO, Appellee.
No. 83-1573.
District Court of Appeal of Florida, Fifth District.
May 3, 1984.
*1176 Robert W. Smith of Pino, Knox & Smith and Marcia Ramsdell, Orlando, for appellant.
Robert L. Hamilton, City Atty., and Michael S. Webb, Chief Asst. City Atty., Orlando, for appellee, The City of Orlando.
Gregory A. Presnell of Gregory Presnell, P.A., and Anne R. Schultz of Akerman, Senterfitt & Eidson, Orlando, for appellee, Westinghouse Elec. Corp.
Thomas B. Tart, Staff Counsel, and Paul R. Linder of Gurney & Handley, P.A., Gen. Counsel, Orlando, for appellee, Orlando Utilities Com'n.
SHARP, Judge.
Six taxpayers and qualified electors of the City of Orlando (City) appeal from the circuit court's final order dismissing their petition for writ of mandamus to compel the City to take action on their petition to amend the City Charter, pursuant to section 166.031, Florida Statutes (1983).[1] If approved by the voters, the City's Charter would be amended by adding two sections, and the City Code would be amended by adding one:
Section 1. Section 19 is added to Chapter 15 of the Orlando City Charter to read: `The Orlando Utilities Commission is hereby prohibited from constructing, or assisting in any way the construction of, any coal-fired electrical generating plant in Orange County. This section may be strengthened by either the Utilities Commission or the City Council of Orlando but this section cannot be weakened or repealed except by a referendum election of the registered voters of the City of Orlando.'
Section 2. Section 67 is added to Chapter 13 of the Orlando City Charter to read: `The City of Orlando is hereby prohibited from constructing, or assisting in any way the construction of, any coal-fired electrical generating plant in Orange County. This section may be strengthened by the Orlando City Council but this section cannot be weakened or repealed except by a referendum election *1177 of the registered voters of the City of Orlando.'
Section 3. Section 1.14 is added to Chapter 1 of the Orlando City Code to read: `The City of Orlando is hereby prohibited from constructing or assisting in any way the construction of, any coal-fired electrical generating plant in Orange County. This section may be strengthened by the Orlando City Council but this section cannot be weakened or repealed except by a referendum election of the registered voters of the City of Orlando.'
The Orlando Utilities Commission (OUC) is currently in the process of constructing a coal-fired electric generating plant in Orange County, outside the City limits. The petition also contains a severability clause so that remaining provisions of the petition would be unaffected in the event some were declared invalid.
The petitioners allege in their verified petition for mandamus that pursuant to section 166.031 they obtained 12,072 signatures, which represents more than fifteen percent of the City's registered voters, in support of the proposed amendments. The City accepted the petition and signatures, but refused to verify or process the signatures upon advice of the City Attorney that the substantive matters of the proposed amendments were beyond the scope of the City's powers given to it by the Municipal Home Rule Powers Act, Chapter 166, Florida Statutes (1983).[2] A petition for writ of mandamus was then filed in circuit court against the City to require it to proceed with the referendum process. The OUC and Westinghouse Electric Corporation intervened on the side of the City in the trial court, and we allowed them to appear as appellees in this appeal.
After a hearing strictly limited to the pleadings, the trial court agreed with the City's position and held that since the matters in the proposed amendments were beyond the scope of the referendum power of the Municipal Home Rule Powers Act, mandamus would not lie to require the City to process the referendum. We disagree with the trial court's rulings as to those parts of the proposed amendments dealing with the City, but we agree as to the proposed amendment dealing with the OUC.
When a mandamus proceeding to enforce a referendum or initiative process is brought, courts generally restrict their consideration of potential legal problems which could affect the validity of an ordinance or charter amendment, should it become law by voter approval.[3] If the allegations are sufficient to invoke the referendum or initiative process, the proposals are put to the voters. Nash v. Richard, 174 So.2d 611 (Fla.3d DCA), cert. denied, 183 So.2d 211 (Fla. 1965). Here the allegation that fifteen percent of the electorate signed the petition more than satisfies the requirements of section 166.031(1), which provides:
The governing body of a municipality may, by ordinance, or the electors of a municipality may, by petition signed by 10 percent of the registered electors, submit to the electors of said municipality a proposed amendment to its charter, which amendment may be to any part or to all of said charter except that part describing the boundaries of such municipality. The governing body of the municipality shall place the proposed amendment contained in the ordinance or petition to a vote of the electors at the next general election held within the municipality or at a special election called for such purpose.
*1178 In their discretion, however, the courts may make an initial determination as to whether or not the substantive provisions of the proposed amendments, are facially constitutional and are within the powers of the enacting body. Fine v. Firestone, 448 So.2d 984 (Fla. 1984); City of Miami Beach v. Smith, 165 So.2d 748 (Fla. 1964); Dade County v. Dade County League of Municipalities, 104 So.2d 512 (Fla. 1958); 42 Am.Jur.2d Initiative And Referendum § 48 (1969). Since the verification of the signatures and the subsequent referendum in this case may be a costly process, and since the lower court passed on the facial validity of the proposals, we will embark on a similar undertaking. However, in no manner should our opinion be taken as approving or disapproving the merits of the proposed amendments.
We think the electors' powers to legislate by initiative or referendum is coextensive with the City's power to act on the proposals in this case. See City of East Lake v. Forest City Enterprises, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); Florida Land Company v. City of Winter Springs, 413 So.2d 84 (Fla. 5th DCA 1982), aff'd, 427 So.2d 170 (Fla. 1983); Barnes v. City of Miami, 47 So.2d 3 (Fla. 1950). Further, where part of an initiative or referendum is unconstitutional and other parts are constitutional, the valid proposals should nevertheless be submitted to the voters, if they would have a possible field of operation.[4] Accordingly, we view the issue in this case as follows:
Do the proposed charter amendments, in their entirety, exceed or contravene a municipality's powers as provided by Article VIII, section 11, of the Florida Constitution or the Municipal Home Rule Powers Act, Chapter 166, Florida Statutes (1983), which implements that Article?

I. AMENDMENTS PERTAINING TO THE CITY OF ORLANDO
The second and third sections of the proposed initiative would amend the City's charter and code by prohibiting it from constructing or assisting in any way the construction of any coal-fired electrical generating plant in Orange County. Appellees argue that under the Municipal Home Rule Powers Act cities may not legislate by passing an ordinance or charter amendment which involves the exercise of extraterritorial powers.
Section 166.021, Florida Statutes (1983), while granting cities broad inherent home rule powers, expressly excepts certain designated powers including the "exercise of extraterritorial powers."[5] The statute further provides that the exercise of extraterritorial powers by a municipality requires enactment of a "general or special law pursuant to S. 2(c), Art. VIII, of the State Constitution... ."[6] The source of extraterritorial powers granted to cities clearly must be found in general or special laws passed by the state legislature.
In this case, the City has extraterritorial powers granted it by a special act of the legislature. Chapter 61-2589, Laws of Florida, authorizes the OUC to acquire, manage, and construct electrical generating plants within the boundaries of Orange and Brevard Counties, and to furnish electrical power to users within Orange County. But it also grants to both the OUC and the City the power and authority "to do all things necessary or required to carry into effect the provisions of this act."
However, beyond that, appellees argue, cities who have been granted extraterritorial powers cannot change such powers granted to them by passing ordinances or amending their charters. Subsection (4) of section 166.021 prohibits any changes in a municipal charter or a special law which *1179 affect, among other things, "the exercise of extraterritorial powers or which affect an area which includes lands within and without a municipality... ." § 166.021(4), Fla. Stat. (1983). The concluding phrase of that sentence allows such changes, but only after approval by a referendum of the voters. Appellees argue that the grammatic structure and logic of the sentence compels the construction that the exercise of extraterritorial powers is excluded from the referendum process, and that the referendum only applies to the six listed items following the second "or any changes in."[7]
Whether or not we agree with appellees' reading of subsection (4), we think that in this case the passage of the proposed ordinance and amendments would constitute the exercise of powers granted the City by Chapter 61-2589, which permits the City to assist the OUC in the construction of a plant, or perhaps even build one on its own, beyond its own boundaries in Orange or Brevard Counties. However, the City is not compelled to do so by Chapter 61-2589. Therefore, without affecting the Act, it could properly refuse either to assist in the construction of a plant, or to build one itself in Orange County.
Because decisions dealing with the building and location of an electrical plant are proper subjects for the exercise of a city's legislative powers, they are proper subjects for an initiative or referendum vote.[8] We do not think the City would be prevented from taking such action by any general or special law currently in existence.[9] Therefore, we do not think the electors of the City are foreclosed from voting on this proposition as it relates to actions to be taken by the City.
We note, however, that the provision in the proposed amendments which would make the charter, if amended as proposed, not subject to repeal except by another referendum election of the registered voters of the City, does conflict with the Municipal Home Rule Powers Act. Section 166.031(1) provides that the governing body of a city or the electors by petition signed by ten percent of the electors, may amend the city charter. Subsection (3) further provides:
A municipality may amend its charter pursuant to this section notwithstanding any charter provisions to the contrary. This section shall be supplemental to the provisions of all other laws relating to the amendment of municipal charters... .
Since this part of the proposed amendment directly conflicts with the Municipal Home Rule Powers Act, it would not be of any legal effect.
Secondly, appellees argue that the proposed amendments would violate the Florida Electrical Power Plant Siting Act, sections 403.501-.539, Florida Statutes (1983), *1180 since the coal-fired plant being currently constructed by the OUC has been through the lengthy and complex state permitting and licensing process. See Florida Chapter of the Sierra Club v. Orlando Utilities Commission, 436 So.2d 383 (Fla. 5th DCA 1983). Section 403.502 states:
The Legislature finds that the present and predicted growth in electric power demands in this state requires the development of a procedure for the selection and utilization of sites for electrical generating facilities and the identification of a state position with respect to each proposed site. The Legislature recognizes that the selection of sites and the routing of associated transmission lines will have a significant impact upon the welfare of the population, the location and growth of industry, and the use of the natural resources of the state. The Legislature finds that the efficiency of the permit application and review process at both the state and local level would be improved with the implementation of a process whereby a permit application would be centrally coordinated and all permit decisions would be reviewed on the basis of standards and recommendations of the deciding agencies. It is the policy of this state that, while recognizing the pressing need for increased power generation facilities, the state shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interests of the public. Such action will be based on these premises... .
The stated legislative intent, and the substantive provisions of the Siting Act show that the area preempted by the state is the process by which a utility or public authority obtains permission and a certification of need in order to build a plant. Whether a city or a utility initially decides to build a plant, or having decided to do so, decides not to continue, is beyond the scope of Chapter 403. Therefore, there is no preemption problem with the charter amendments.
Finally, appellees argue that the proposed amendments, if adopted by the voters, would substantially impair existing contracts with suppliers and builders, in particular Westinghouse, which is constructing the turbine generator and related equipment for the plant under construction, in violation of the United States and Florida Constitutions.[10] It is not clear that any contract involved in the current plant construction is with the City, or that the City's rejection of any such contract would leave the other party without a remedy adequate at law. Continental Illinois National Bank and Trust Company of Chicago v. Washington, 696 F.2d 692 (9th Cir.), appeal dismissed, ___ U.S. ___, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983). See also Exxon Corporation v. Eagerton, ___ U.S. ___, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). Further, although this and other kinds of attacks may lie to challenge the application of the charter amendments or ordinance, or may result in damages being awarded against the City, if the electors vote it into being, we need only consider issues relating to the facial constitutionality of the proposals for purposes of this appeal. Cf. Florida Land Company.

II. AMENDMENT PERTAINING TO THE ORLANDO UTILITY COMMISSION
The OUC was created in 1923 by a Special Act passed by the legislature, Chapter 9861-(No. 743), Laws of Florida (1923). It established the OUC as a "part of the government of the City of Orlando, Florida," but provided that the OUC would have substantial autonomy to operate independently from the City government. The *1181 members of the commission, named in the act, were empowered to nominate their successors, subject to the approval of the City Council. The OUC was given "full authority" over "the management and control of the electric light and water works plant in the City of Orlando,"[11] and was authorized to furnish electricity, power, and water to users in any part of Orange County. The OUC was also given the power to set rates for the consumers. The act took effect only after the affirmative vote of a majority of the freeholders of the City.
Subsequent special acts expanded the OUC's powers. Chapter 31077, Laws of Florida (1955), which also became effective upon ratification by the City electors, gave the OUC the "full power and authority to prescribe rules, rates, and regulations governing the sale and use of electricity, power and water wherever furnished by said Commission, and to change the same at its pleasure." Chapter 31092, Laws of Florida (1955), passed after an affirmative vote of the City electors, provided that the OUC has "full authority over the management and control of the electric light and water works plants of the City of Orlando...."
In 1961, Chapter 61-2589, section 9, Laws of Florida, authorized the OUC to "acquire, establish, construct, maintain and/or operate electric generating plants ... within the boundaries of Orange county and Brevard county... ." Section 9(b) allowed the OUC "to do all things necessary or required to carry into effect the provisions of this act." Other acts empowered the OUC to borrow money to defray expenses in connection with acquisition, expansion, operation or maintenance of the electrical facilities.[12]
The relationship between the City and the OUC is perhaps unique in this state. The OUC is a part of the City for some purposes, but we agree with the trial judge that it is independent and beyond the control of the City as regards the powers granted to it under the special acts. City of Orlando v. Evans, 132 Fla. 609, 182 So. 264 (Fla. 1938), held that the OUC could expand the electric light and water works plant without the approval of the City. Although Evans did not deal with the precise issue of whether the City may pass an ordinance prohibiting the OUC's activities, the inference is clear that such an ordinance would have no effect.
This result was justified in Cobo v. O'Bryant, 116 So.2d 233 (Fla. 1959), on the grounds that under the 1898 Constitution, cities had no inherent self-rule powers, and were subject to the control and special laws passed by the legislature, which meant that the legislature had absolute discretion in choosing to grant the powers to manage, control, and expand a city utility to an independent board or commission outside any type of control of a city.
The Legislature in its wisdom merely established a municipal agency to operate the publicly owned property for the benefit of the public. Whether or not this court deems such legislation wise or salutory is of no consequence at all.
Id. at 237.
Appellants argue that the reasoning in Cobo and Evans has been superseded by Article VIII of the Florida Constitution and the Municipal Home Rule Powers Act, which give the cities of Florida inherent governing powers. Both the Constitution and the Municipal Home Rule Powers Act contain broad grants of inherent, or unexpressed, powers to cities.[13]
The Municipal Home Rule Powers Act gives cities "governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, *1182 and may exercise any power for municipal purposes... ." § 166.021(1), Fla. Stat. (1983). "Municipal purpose" is defined in section 166.021(2) as "any activity or power which may be exercised by the state or its political subdivisions." (Emphasis supplied).
The Act further provides that cities have the power to legislate "concerning any subject matter upon which the state legislature may act," except for four described areas. § 166.021(3), Fla. Stat. (1983). However, these grants are limited by the existence of other laws. Article VIII grants cities inherent home rule powers "except as otherwise provided by law."[14] (Emphasis supplied).
The meaning of these excepted powers is not clear.[15] However, we do not think the 1968 Constitution or the Municipal Home Rule Powers Act abolished special or general laws which existed prior to their passage. See § 166.021(5), Fla. Stat. (1983). Nor would inherent home rule powers prevail over a subsequent state law. City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla. 1972); see Reese v. Thorne, 297 So.2d 9 (Fla. 1974).
In this case the legislature gave the OUC exclusive authority to manage, operate and build electric utilities plants in Orange and Brevard Counties by special statutes. These are not part of the City's Charter. Any amendment to the City's Charter which purports to diminish or take away the OUC's powers over the utilities would necessarily be in conflict with those state laws.[16]
It follows that if the City could not by ordinance or charter amendment command the OUC not to build the electrical plant under construction, or any other one, the voters acting through the initiative or referendum process cannot do so either.[17] The City/OUC tandem is a unique and strange one. The City and its electors have no control over the OUC; but neither does the OUC have control over the City. The OUC is answerable to no taxpayer or voter group, although it is a public utility. This situation is created by state law and it can only be changed by state law.
In summary, we hold that sections two and three of the proposed amendments to the City Charter and Code are facially constitutional except for their attempt to alter the Municipal Home Rule Powers Act regarding future charter changes. However, section one, which prohibits the OUC from constructing the electrical plant, is facially unconstitutional because it is in direct conflict with state laws which grant the OUC complete authority and control over the utility. The invalid matters should be stricken from the ballot presented to the voters. In this case the electors of Orlando seek the chance to tell their City to stop building or assisting the OUC to build the new plant or any other coal-fired plant in Orange County. We think that they have the right to vote on this issue pursuant to section 166.031.
Accordingly, we quash the lower court's final order dismissing the petition for mandamus, and remand this cause for further proceedings consistent with this opinion.
ORDER QUASHED AND CAUSE REMANDED.
DAUKSCH and COWART, JJ., concur.
NOTES
[1] Appellants argued below that Chapter 2, section 14 of the Orlando City Code also provided a source for this referendum power. It provides in part:

Any proposed ordinance may be submitted to the council by a petition signed by fifteen percent of the total number of qualified registered voters of the City of Orlando... . If a majority of the qualified voters voting on the proposed ordinance shall vote in favor thereof, said ordinance shall thereupon become a valid ordinance of the city.
However, on appeal, petitioners urge that section 166.031, Florida Statutes (1983), is the source of the referendum power in this case since the petition would amend the City Charter.
[2] The City argues that mandamus should be denied because it has not yet verified the voter signatures on the petition. However, upon submission of the petition, the City has the clear legal duty to proceed to verify the signatures, and then to hold the election pursuant to the Municipal Home Rule Powers Act, Chapter 166, Florida Statutes (1983). The fact that it has not done so does not foreclose our consideration of the issues raised by the petition for mandamus.
[3] City of Coral Gables v. Carmichael, 256 So.2d 404 (Fla. 3d DCA), cert. dismissed, 268 So.2d 1 (Fla. 1972); 5 E. McQuillin, Municipal Corporations §§ 16.52, 16.68 (3d ed. 1981).
[4] Dade County v. Dade County League of Municipalities, 104 So.2d 512 (Fla. 1958); E. McQuillin, supra note 3, at § 16.69.
[5] § 166.021(3)(a), Fla. Stat. (1983).
[6] Article VIII, section 2(c) of the Florida Constitution provides that the "exercise of extraterritorial powers by municipalities shall be as provided by general or special law."
[7] Subsection (4) of section 166.021, Florida Statutes (1983) provides:

The provisions of this section shall be so construed so as to secure for municipalities the broad exercise of home rule powers granted by the constitution. It is the further intent of the Legislature to extend to municipalities the exercise of powers for municipal governmental, corporate, or proprietary purposes not expressly prohibited by the constitution, general or special law, or county charter and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited. However, nothing in this act shall be construed to permit any changes in a special law or municipal charter which affect the exercise of extraterritorial powers or which affect an area which includes lands within and without a municipality or any changes in a special law or municipal charter which affect the creation or existence of a municipality, the terms of elected officers and the manner of their election, the distribution of powers among elected officers, matters prescribed by the charter relating to appointive boards, any change in the form of government, or any rights of municipal employees, without approval by referendum of the electors as provided in s. 166.031. Any other limitation of power upon any municipality contained in any municipal charter enacted or adopted prior to July 1, 1973, is hereby nullified and repealed.
[8] Scott v. City of Orlando, 173 So.2d 501 (Fla. 2d DCA 1965).
[9] State v. City of Riviera Beach, 397 So.2d 685 (Fla. 1981); Hope v. City of Gainesville, 195 So.2d 849 (Fla. 1967).
[10] U.S. CONST., art. I, § 10; Art. I, § 10, Fla. Const.
[11] Ch. 9861-(No. 743), § 6, Laws of Fla. (1923).
[12] See Ch. 83-343, Laws of Fla.; Ch. 82-415, Laws of Fla.
[13] Article VIII, Section 2(b) of the Florida Constitution provides:

[m]unicipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services and may exercise any power for municipal purposes except as otherwise provided by law.
[14] See also § 166.021(1), Fla. Stat. (1983).
[15] Sparkman, The History and Status of Local Government Powers in Florida, 25 U.Fla.L.Rev. 271 (1973).
[16] Cf. Carol City Utilities, Inc. v. Dade County, 183 So.2d 227 (Fla. 3d DCA 1966), where Metro Dade County created under its home rule powers a water and sewer board with powers to set rates and service areas.
[17] 1981 Op. Att'y Gen. Fla. 081-92 (Nov. 25, 1981); see Mervynne v. Acker, 189 Cal. App.2d 558, 11 Cal. Rptr. 340, (Ct.App. 1961); State ex rel. Guthrie v. City of Richland, 80 Wash.2d 382, 494 P.2d 990 (1972); Denning v. City of Green Bay, 271 Wis. 230, 72 N.W.2d 730 (1955); E. McQuillin, supra note 3, at § 16.52.