**SDDS, INC., a South Dakota corporation, Plaintiff,**

v.

**STATE OF SOUTH DAKOTA, Mark Barnett, as Attorney General for the State of South Dakota; Walter D. Miller, as Governor of the State of South Dakota; and Joyce Hazeltine, as Secretary of State of the State of South Dakota, Defendants,**

**and**

**Action for the Environment, Intervenor/Defendant.**

No. 91–5121.

United States District Court, D. South Dakota, W.D.

Jan. 28, 1994.

Marvin D. Truhe, Rapid City, SD, Edward T. Lyons, Jr., David E. Driggers, Thomas J. Burke, Jr., Jones & Keller, Denver, CO, for plaintiff.

Mark W. Barnett, Roxanne Giedd, Diane M. Best, Atty. General's Office, Pierre, SD, for defendants.

Bruce H. Ellison, Rapid City, SD, for intervenor.

## MEMORANDUM OPINION

BATTEY, District Judge.

### PROCEDURAL HISTORY

On October 18, 1993, defendants the State of South Dakota, Attorney General of South Dakota Mark Barnett, Secretary of State Joyce Hazeltine, and Governor Walter D. Miller (collectively "defendants") filed a second motion seeking summary judgment in

their favor. On December 3, 1993, plaintiff South Dakota Disposal Systems, Inc. (SDDS) filed a response in opposition to defendants' motion and a cross motion for summary judgment in favor of SDDS. Based upon this memorandum opinion, defendants' motion is granted.

## FACTS

The facts of this case are complicated by a series of seven judicial opinions which have resulted from the numerous lawsuits initiated by SDDS. Because all but one of these decisions have some bearing on the present lawsuit before this Court, a brief reference to these decisions will be included.

### A. Preliminary Events

On November 17, 1988, SDDS applied for a permit with the South Dakota Department of Water and Natural Resources (Department). SDDS sought a permit to construct and operate the Lonetree Facility in Fall River County, South Dakota. SDDS intended to dispose of baled municipal solid waste (MSW) at Lonetree. The Department ultimately published a recommendation to deny the permit.

Under South Dakota law, SDDS had a right to request a contested case hearing before the Board of Minerals and Environment (BME) and SDDS did so. Technical Information Project (TIP) intervened and an evidentiary hearing was held before the BME. On September 21, 1989, the BME issued SDDS a one-year permit allowing Lonetree to accept up to 300,000 tons of MSW during the term of the permit. TIP appealed the BME decision to a South Dakota trial court, which affirmed the BME decision. TIP then appealed the trial court decision to the South Dakota Supreme Court.

While the court case concerning the one-year permit was winding its way through court, in March of 1990 SDDS applied for a renewal permit. SDDS sought a five-year renewal of its initial permit allowing Lonetree to take in 7.75 million tons of MSW. SDDS had no contracts for the disposal of the waste at this time, but anticipated that 90 percent of its 7.75 million tons of MSW would come from outside of South Dakota.

In the spring of 1990, the Surface Mining Initiative Fund (SMIF), now Action for the Environment (ACT), collected petitions sufficient to place an Initiated Measure [1] on the ballot at the November 6, 1990, general election. The Initiated Measure required that all large-scale solid waste disposal facilities obtain legislative approval as a prerequisite to operation. Legislative approval was to be given only upon the legislature finding that such facility was environmentally safe and in the public interest. The Initiated Measure defined "large-scale solid waste disposal facilities" as those facilities disposing of over 200,000 tons of solid waste annually. It was passed and became effective on November 22, 1990. The provisions of the measure were applicable retroactively to any facility permitted after July 1, 1989.

On November 7, 1990, the day after the initiated measure passed, SDDS laid off its work force at Lonetree and ceased preparing the site for operation. On December 7, 1990, after another contested case hearing, the BME issued the five-year renewal permit sought by SDDS.

### B. SDDS I (The subject of the one-year permit.)

On June 26, 1991, the South Dakota Supreme Court issued a decision on TIP's ap-

---

[1]. The Initiated Measure (codified at SDCL 34A–6–53 through 34A–6–56) provided as follows:

Section 1. No large scale solid-waste facility may be sited, constructed or operated in this state unless the Legislature enacts a bill approving the siting, construction or operation of such facility pursuant to a solid waste permit or permit renewals, issued by the board of minerals and environment. The Legislature must find that the facility is environmentally safe and in the public interest.

Section 2. A large-scale solid waste facility is any single facility, or two or more facilities operated as a single unit, in which over 200,000 tons of solid waste is disposed of or incinerated per year.

Section 3. The board of minerals and environment shall cause any existing large-scale solid waste facility to cease operation unless or until legislative approval as prescribed in this Act has been obtained.

Section 4. The provisions of this Act are retroactive to July 1, 1989.

peal of the issuance of the one-year permit to SDDS. *See In re Application of SDDS, Inc. for a Solid Waste Permit,* 472 N.W.2d 502 (S.D.1991) (*SDDS I* ). *SDDS I* resolved the issue raised by TIP as to whether the BME's findings were adequate to support the issuance of the one-year permit to SDDS. *Id.* at 510–14. The Supreme Court found that the BME findings were inadequate to support the issuance of the permit. *Id.* at 514.

Specifically, the court stated that under South Dakota law, when a state agency is required to make certain findings of fact on the record, the agency must state in the record its conclusion as well as the basic or underlying facts which supported its conclusion. *Id.* at 512 (citing SDCL 1–26–25). The BME was required to make findings of fact that the permit issued for SDDS met five specific environmental requirements and further that the issuance of the permit was in the public interest. *Id.* at 512–13 (citing ARSD §§ 74:27:03:08, 74:27:02:01, 74:27:03:07, 74:27:04:04, and 74:27:04:09). The BME had merely stated its conclusions that the permit issued to SDDS was in the public interest and that the waste facility was environmentally safe. *Id.* at 512–13. The BME did not state the underlying or basic facts supporting its conclusions, as was required under South Dakota law. *Id.* Therefore, the South Dakota Supreme Court held that there were no findings which would support the issuance of the permit to SDDS and reversed. *Id.* at 514. The one-year permit was therefore a nullity.

## C. SDDS III (The constitutionality of the Initiated Measure.)

On December 7, 1990, the day SDDS received its five-year renewal permit from the BME, SDDS filed an action before a state trial court challenging the constitutionality of the Initiated Measure under the South Dakota and United States Constitutions. SDDS argued, among other things, that the Initiated Measure violated its rights to due process of law, violated the dormant aspect of the interstate commerce clause, and violated the equal protection clause.

Judge Steven Zinter, Circuit Judge for the Sixth Judicial Circuit of South Dakota, issued a decision on October 31, 1991, denying most of the claims raised by SDDS. Specifically, Judge Zinter found that the Initiated Measure did not violate the rights of SDDS under either the equal protection clause or the dormant aspect of the interstate commerce clause. As to the violation of due process rights alleged by SDDS, Judge Zinter held that the retroactive provision of the Initiated Measure did violate SDDS's rights insofar as it interfered with SDDS's rights under the one-year permit. However, as to the five-year permit, Judge Zinter held that SDDS did not have a constitutionally protected property interest in the five-year permit at the time the Initiated Measure became law because the BME did not grant the five-year permit until after the measure became effective. Because SDDS had no property interest in the five-year permit, Judge Zinter ruled that SDDS had no due process rights which could be violated in connection with that permit.

## D. Actions Occurring Between *SDDS I* and *SDDS II*

Immediately following the decision in *SDDS I,* the BME conducted a remand hearing on the one-year permit. TIP again appealed the permit to a state trial court. Before the trial court could issue a decision, the next decision by the South Dakota Supreme Court was issued.

In February 1991, the South Dakota Legislature passed and the governor signed Senate Bill 169 (S.B. 169) which approved the Lonetree facility pursuant to the requirements of the Initiated Measure.[2] In the

2. Senate Bill 169 provided as follows:
AN ACT ENTITLED, An Act to approve the siting, construction and operation of the Lonetree solid waste disposal facility.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:
The Legislature hereby finds that the Lonetree solid waste disposal facility is environmen-

tally safe and in the public interest and approves the siting, construction and operation of the Lonetree solid waste disposal facility near Edgemont, South Dakota, subject to the terms and conditions of permit number 89–7 and permit renewal number 90–20 granted by the board of minerals and environment for the facility. The department of water and natural

spring of 1991, ACT filed petitions with the secretary of state sufficient to refer S.B. 169 to a vote of the electorate at the next general election in November 1992.

### E. SDDS II [3] (The subject of the effective date of S.B. 169.)

SDDS commenced *SDDS II* in state court seeking a declaration that when the legislature passed and the governor signed S.B. 169, SDDS had obtained the legislative approval required by the Initiated Measure and could immediately thereafter begin operating its disposal facility notwithstanding the pending Referendum. *SDDS, Inc. v. State*, 481 N.W.2d 270, 272 (S.D.1992) (*SDDS II* ). On February 19, 1992, the South Dakota Supreme Court held that in South Dakota a law does not become effective until passed by the legislature, signed by the governor, and, if referred, until approved by a majority vote in the next general election. *Id.* Therefore, the court reasoned that S.B. 169 was not yet effective because, although it had been passed by the legislature and signed by the governor, proper petitions for referral of S.B. 169 had been timely filed with the secretary of state and the referral election had not yet been held. *Id.*

Justice Amundson wrote an opinion concurring in the result that the majority had reached. *Id.* at 273–74 (Amundson, J., concurring). Justice Amundson stated that, because the BME had failed to make the express findings of fact required by law, the BME action purporting to issue the one-year permit was void. *Id.* at 273. Because the one-year permit was void, Justice Amundson wrote that SDDS could not begin operating even if SDDS had obtained legislative approval. *Id.* at 274. Essentially, Justice Amundson held the legislative approval to be meaningless because, without a permit, there was nothing for the legislature to approve in passing S.B. 169. *Id.*

### F. Initial Decision in This Court

Following Judge Zinter's decision on the constitutionality of the Initiated Measure, SDDS in November 1991 filed its complaint with this Court seeking a decision on the constitutionality of the Referendum. SDDS alleged in its complaint that the Referendum violated its rights to equal protection, procedural due process, and substantive due process. SDDS also alleged that the Referendum violated the dormant aspect of the interstate commerce clause.

On April 6, 1992, this Court issued a memorandum opinion and order granting summary judgment to defendants. The Court declined to accept defendants' argument that SDDS was precluded by *res judicata* (also known as claim preclusion), from bringing its claims before this Court. However, the Court found that SDDS was precluded by *collateral estoppel* (also known as issue preclusion) from bringing its claims before this Court. Specifically, the Court found to be binding Judge Zinter's ruling that SDDS had no constitutionally protected property interest in the five-year permit. SDDS appealed to the Eighth Circuit Court of Appeals.

### G. Eighth Circuit's Decision

On June 1, 1993, the United States Court of Appeals for the Eighth Circuit issued a decision reversing this Court's grant of summary judgment to defendants. *See SDDS, Inc. v. South Dakota*, 994 F.2d 486 (8th Cir.1993). In that decision, the Eighth Circuit affirmed this Court's conclusion that SDDS was not precluded by *res judicata* from pursuing its claims in federal district court. *Id.* at 492. However, the Eighth Circuit reversed this Court's conclusion that SDDS was precluded by *collateral estoppel* from pursuing its claims. *Id.* at 494. The Eighth Circuit stated that, for *collateral estoppel* to bar SDDS's claims, the issues be-

---

resources shall make daily inspections of representative samples of solid waste accepted for disposal at the Lonetree solid waste disposal facility for the purpose of monitoring the characteristics and composition of materials accepted at the facility.

**3.** Although chronologically, Judge Zinter's decision intervened between *SDDS I* and *SDDS II*,

the parties have characterized Judge Zinter's decision as "*SDDS III*." To avoid confusion, the Court will continue to refer to Judge Zinter's decision as *SDDS III* and the subsequent, second decision of the South Dakota Supreme Court as *SDDS II*.

fore Judge Zinter and before this Court must have been identical. *Id.* at 492. Because the issue before Judge Zinter was the constitutionality of the Initiated Measure and the issue before this Court is the constitutionality of the Referendum, the Eighth Circuit held that the issues before the two courts were *not* identical. *Id.* at 493. The Eighth Circuit remanded to this Court, directing that this Court examine the validity of the Referendum with regard to SDDS's due process, equal protection, and commerce clause challenges. *Id.* at 493. Specifically, the Eighth Circuit rejected this Court's finding that it was bound by Judge Zinter's holding that SDDS had no constitutionally protected property interest in the five-year renewal permit. *Id.* at 493–94. The court emphasized that SDDS's property interest in the five-year renewal permit must be evaluated as of the date the Referendum became effective: November 22, 1992. *Id.* at 494. Judge Zinter's decision had been issued before the Referendum. The Eighth Circuit held:

> By the time of the Referendum, SDDS had in fact secured the Five–Year Permit Renewal from the BME and in addition the legislature had complied with the Initiated Measure by passing S.B. 169. Therefore, the status of SDDS's property interest was different at the time of the Referendum than it was at the time of the Initiated Measure. Whether the later property interest is any greater or more worthy of constitutional protection is one of the issues the district court must decide on remand.

*Id.*

## H. November 3, 1993, Decision of the South Dakota Supreme Court [4] (The subject of the five-year renewal permit.)

After the South Dakota Supreme Court issued *SDDS II,* holding that S.B. 169 was

not effective until the vote on the Referendum, the state trial court remanded TIP's appeal of the BME's remand hearing on the one-year permit. On remand, the BME refused to take further action on the permit application until a definitive ruling was made on the validity of the one-year permit. On July 14, 1992, the South Dakota trial court ruled that there never was a valid one-year permit and, therefore, there could be no renewal of a nonexistent permit. Therefore, the state trial court concluded that the five-year permit was void from the start.

The South Dakota Supreme Court affirmed. *See In re the 1990 Renewal Application of SDDS, Inc.,* 507 N.W.2d 702 (S.D. 1993). The court held that the one-year permit was void and had never been valid because it had been issued without the statutorily-mandated findings of fact. *Id.* at 704. Because the one-year permit never legally existed, the court concluded that there was no permit to renew. *Id.* Therefore, the court held that the five-year renewal permit was void *ab initio. Id.*

## I. Summary Judgment Issues

The issues before the Court are:

1. whether the Referendum violates SDDS's right to procedural or substantive due process as guaranteed by the 14th amendment to the United States Constitution;

2. whether the Referendum violates SDDS's right to equal protection under the law as guaranteed by the 14th amendment to the United States Constitution; and

3. whether the Referendum violates the interstate commerce clause of Article 1, § 8, clause 3 of the United States Constitution.

---

4. There was also one other decision of the South Dakota Supreme Court which intervened between the Eighth Circuit's decision and this Court's current memorandum opinion. *See SDDS, Inc. v. State,* 502 N.W.2d 852 (S.D.1993) (*SDDS IV*). On June 30, 1993, the South Dakota court entertained an interlocutory appeal from a pending inverse condemnation case initiated by SDDS in Fall River County seeking money damages as a result of the Referendum and Initiated Measure. *Id.* at 853–54. The court held in its opinion that Hughes County was the only appropriate venue for SDDS's action. *Id.* at 854, 857. Presumably, SDDS's suit for money damages is still pending at this time, but the case appears to have no bearing on the suit presently pending before this Court.

## DISCUSSION

### A. Constitutionality of the Referendum Process

Although the Court does not interpret SDDS to so argue, defendants have suggested that SDDS may be arguing in this lawsuit that the South Dakota referendum process as a whole is constitutionally infirm. The Court interprets SDDS to be arguing in this lawsuit that the referendum by which S.B. 169 was defeated was unconstitutional and therefore invalid.

 The Court's short answer is that our federal constitution is based on the tenet that all power derives from the people who have the power to delegate that power to representatives. *City of Eastlake v. Forest City Enters., Inc.,* 426 U.S. 668, 672, 96 S.Ct. 2358, 2361, 49 L.Ed.2d 132 (1976). In delegating power to legislative bodies, "the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature." *Id.* at 672, 96 S.Ct. at 2361. South Dakota's referendum "is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.'" *Id.* at 673, 96 S.Ct. at 2363 (quoting *James v. Valtierra,* 402 U.S. 137, 141, 91 S.Ct. 1331, 1333, 28 L.Ed.2d 678 (1971)). The Referendum process is subject to the same constitutional limitations as other legislative acts. *Cf. City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 448, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985) (holding that the electorate cannot order governmental action through a referendum which violates the equal protection clause of the fourteenth amendment); *Eastlake,* 426 U.S. at 676, 96 S.Ct. at 2363 (stating that referendums are subject to the same due process limitations as other legislation). This conclusion leads the Court to a consideration of the due process claims.

### B. SDDS's Due Process Claims

 SDDS alleges in its complaint that the Referendum deprived SDDS of its property interest in operating the Lonetree facility in violation of SDDS's procedural and substantive due process rights as provided for in the fourteenth amendment to the United States Constitution. *See* U.S. Const. amend. XIV, § 1 (prohibiting states from depriving its citizens of life, liberty, or property without due process of law). The procedural prong of the due process clause requires that a state provide notice and an opportunity for a hearing before the deprivation occurs. The substantive prong of the due process clause prohibits states from acting arbitrarily in depriving persons of life, liberty, or property, even if adequate process is accorded. Essentially, substantive due process provides that there are certain deprivations which government cannot undertake regardless of the process used.

 To prove both its substantive and procedural due process claims, SDDS must prove that it was deprived of a constitutionally protected property or liberty interest. *Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986) (procedural due process); *Collins v. City of Harker Heights, Texas,* — U.S. ——, ——–——, 112 S.Ct. 1061, 1070–71, 117 L.Ed.2d 261 (1992) (substantive due process); and *Bishop v. Tice,* 622 F.2d 349, 353–54 (8th Cir.1980) (substantive due process). The Constitution does not define "property" or "liberty" for purposes of the due process clause of the fourteenth amendment. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Such interests are created by state law. If SDDS acquired the property right to operate under a grant protected by state law, then it would have rights protected by both procedural and substantive due process. The Court concludes that SDDS is unable to show a property right; therefore, both of SDDS's due process claims must fail.

Under South Dakota law, SDDS needs two things in order to operate its Lonetree facility: (1) a valid permit and (2) legislative approval from the South Dakota Legislature. *See* SDCL 34A–6–1.4 to 34A–6–1.13 (solid waste disposal facilities must obtain permits); and SDCL 34A–6–53 to 34A–6–56 (solid waste disposal facilities handling in excess of

200,000 tons of waste annually must get legislative approval for their operations).

At the time of the Referendum in November 1992, SDDS's one-year permit had expired. In any event, that one-year permit was void because the BME, in issuing the permit, failed to make specific findings of fact that the Lonetree facility was in the public interest and that the facility met five specified environmental prerequisites. *See In re the 1990 Renewal Application of SDDS, Inc.*, 507 N.W.2d 702, 703–04 (S.D. 1993); and *SDDS I*, 472 N.W.2d 502, 510–14 (S.D.1991) (citing SDCL 1–26–25 and ARSD §§ 74:27:02:01, 74:27:03:07, 74:27:03:08, 74:27:04:04, and 74:27:04:09).

Although the BME had issued SDDS a five-year renewal permit and the Legislature had passed S.B. 169 approving the operation of the Lonetree facility, the five-year permit was invalid because it was based upon an invalid one-year permit. *In the Matter of the 1990 Renewal Application of SDDS, Inc.*, 507 N.W.2d at 703–04. The five-year renewal permit was void *ab initio*. *Id.*[5] In other words, SDDS has never had a valid permit to operate the Lonetree facility. Without a valid permit, SDDS has no constitutionally protected property interest in operating the facility. Both of SDDS's due process claims fail.

The Court notes that SDDS's remaining commerce clause and equal protection claims rest solely on the effect of the Referendum, the validity of the Initiated Measure having already been decided by Judge Zinter. Furthermore, because SDDS has never had a valid permit to operate its Lonetree facility,

S.B. 169 and the subsequent Referendum "vetoing" that bill have no practical effect. By the very unambiguous terms of the Initiated Measure (see n. 1), legislative approval may only be granted to a facility that is operational "pursuant to solid waste permit." SDCL 34A–6–53. SDDS has never had a valid permit. The legislature cannot have granted approval of the Lonetree facility if the facility had no permit to operate. It logically follows that if the legislature was not in a position to grant approval to the Lonetree facility, then the enabling legislation (S.B. 169) was of no effect. The Referendum would also be of no effect. If the Referendum had no effect, the commerce clause and the equal protection clause are not implicated.[6] The Court will nonetheless address the merits of SDDS's commerce clause and equal protection claims. Upon appellate review, the appellate court may have wished the Court to do so.

## C. SDDS's Commerce Clause Claim

■■■ The United States Constitution grants to Congress the power to regulate commerce between the states. U.S. Const. art. I, § 8. The "negative" or "dormant" aspect of the commerce clause acts as a limitation on the ability of individual states to interfere with the flow of commerce between the states. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, — U.S. —, —, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992); *Waste Sys. Corp. v. County of Martin*, 985 F.2d 1381, 1385 (8th Cir.1993). The motivating idea behind a dormant commerce clause analysis is that "one

5. In addition, the Court notes that S.B. 169 never became effective because, although passed by the legislature and signed by the governor, S.B. 169 was properly referred to a vote of the electorate and the electorate effectively vetoed the bill. *See SDDS, Inc. v. State*, 481 N.W.2d 270, 272 (S.D. 1992) (holding that in South Dakota, a law does not become effective until passed by the legislature, signed by the governor, and, if properly referred, until approved by a majority vote of the electorate in the next general election). However, because the Referendum is precisely the action about which SDDS complains, the Court does not rely on the fact that the Referendum stayed the effective date of S.B. 169 to reach its conclusion that SDDS had no protected property interest.

6. SDDS argues in this regard that Judge Zinter, in *SDDS III*, held that the Initiated Measure did not require SDDS to get legislative approval with each renewal of its permit. Therefore, SDDS argues that, once S.B. 169 was passed, the Referendum *did* have a practical effect because, even without a valid permit, should SDDS obtain a permit in the future, it would not need to get legislative approval again. However, both *SDDS III* and the Initiated Measure make clear that legislative approval can only be given to a facility that is otherwise properly permitted. Because SDDS has never possessed a valid permit, the legislature was not in a position to give its approval under the Initiated Measure.

state in its dealings with another may not place itself in a position of economic isolation." *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935). Although the commerce clause limits the ability of states to interfere with the flow of interstate commerce, it does not completely prohibit such interference if incidental to the promotion of a legitimate state concern. Solid waste is an article of interstate commerce. *Chemical Waste Management, Inc. v. Hunt,* — U.S. —, — n. 3, 112 S.Ct. 2009, 2012 n. 3, 119 L.Ed.2d 121 (1992).

### 1. By Which Standard Should the Referendum be Judged?

Two different standards have evolved for determining whether a state law impermissibly interferes with interstate commerce. If the law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under the *Pike* test, the challenger of the law bears the burden of showing that there is no legitimate state interest or that the burden on interstate commerce is clearly excessive when compared to the local benefits.

If, however, the challenger can show that the state law discriminates against interstate commerce on its face or in practical effect, then the law is subjected to stricter scrutiny and the burden of proving the law's validity shifts to the state. *Chemical Waste Management, Inc.,* — U.S. at —, 112 S.Ct. at 2014; *Fort Gratiot Sanitary Landfill, Inc.,* — U.S. at —, 112 S.Ct. at 2027; *Maine v. Taylor,* 477 U.S. 131, 137–38, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110

(1986). To carry its burden, the state must show that there is a legitimate local purpose served by the law and that that purpose could not be served as well by nondiscriminatory alternatives. *Chemical Waste Management, Inc.,* — U.S. at —, 112 S.Ct. at 2014; *Fort Gratiot Sanitary Landfill, Inc.,* — U.S. at —, 112 S.Ct. at 2027; *Maine,* 477 U.S. at 138, 106 S.Ct. at 2447. Thus, the initial matter which must be decided by this Court is whether the Referendum should be subject to the *Pike* test or to the strict scrutiny test.

The Referendum does not contain any facial reference to in-state or out-of-state waste nor does it refer to facilities owned by in-state or out-of-state corporations. Hence, the Referendum does not discriminate on its face against interstate commerce.

However, the question remains whether the Referendum discriminates against interstate commerce in its practical effect. SDDS claims that it does because the Referendum affected only the Lonetree facility and SDDS anticipated that approximately 90 percent of the 1.4 million tons per year it disposed of at Lonetree would come from out-of-state.[7]

Defendants argue that the Referendum was not discriminatory in effect because it prevented SDDS from disposing of in-state as well as out-of-state waste at Lonetree. Furthermore, defendants point out that at least three other waste disposal facilities in South Dakota currently accept out-of-state waste and the Referendum does not affect the flow of interstate commerce as regards these other facilities. *See* Affidavit of David J. Templeton, Docket No. 64, Exhibit C.

Finally, defendants point out that the Referendum affected only one facility, the Lonetree facility, and that preventing the operation of a single waste disposal facility will not have a practical effect on interstate com-

---

7. SDDS also argues that because Judge Zinter in *SDDS III* held that the Initiated Measure discriminated in practical effect against interstate commerce, that this Court must accept the same conclusion with regard to the practical effect of the Referendum. However, SDDS argued on appeal to the Eighth Circuit that *SDDS III* did not have preclusive effect on its claims before

this Court. Having won on that argument before the Eighth Circuit, SDDS will not now be allowed to claim that certain portions of *SDDS III* which were favorable to SDDS are binding on this Court. The issue of the practical effect of the Initiated Measure is distinct from the issue of the practical effect of the Referendum.

merce.[8] In the vein of this last argument, defendants note that, although SDDS anticipated disposing of 1,260,000 [9] tons of out-of-state waste annually, in fact SDDS never concluded a single contract for the disposal of such waste. Therefore, defendants argue that the impact on interstate commerce from the Referendum's prevention of the operation of the Lonetree facility is speculative, at best.

The issue of whether the Referendum had the effect of isolating South Dakota economically from other states in the interstate commerce of solid waste is a very close one. If the Referendum had not occurred, or if it had resulted in approval of S.B. 169, possibly up to 1,260,000 tons of out-of-state waste would have crossed South Dakota's borders annually to enter the Lonetree facility. The other three South Dakota facilities that accept out-of-state waste received a combined total of 60,000 tons of such waste in 1992—only about 4 percent of Lonetree's projected annual imports. However, that figure may have changed substantially in 1993.

Defendants point out that under South Dakota laws, any validly-permitted waste disposal facility may accept out-of-state waste and, indeed, South Dakota law even contemplates that regional waste disposal facilities *will* accept waste from outside South Dakota. The Court notes that the referral process could not affect out-of-state waste entering any South Dakota waste disposal facility that disposed of up to 200,000 tons of waste annually because legislative approval is not required for such facilities. However, any facility which desired to dispose of over 200,000 tons of waste annually, whether that waste originated in South Dakota or outside the state, would be subject to the legislative approval requirements of the Initiated Measure. Any legislative approval which might be given would then in turn be subject to the referendum process.

Since the time S.B. 169 was voted on by the South Dakota Legislature, the Big Stone power plant in Big Stone City, South Dakota, applied for legislative approval pursuant to the Initiated Measure. Legislative approval was granted and the bill became effective law without an intervening referendum. *See* SDCL 34A–6–105. Although the size of the Big Stone plant is not mentioned by either party, the plant would have to dispose of in excess of 200,000 tons of solid waste annually in order for the legislative approval requirement to be applicable. *See* SDCL 34A–6–53, 34A–6–54. Also, the parties agree that the Big Stone plant accepts out-of-state waste, but nowhere do they specify how much of the plant's 200,000–plus annual tons are composed of out-of-state waste.

The fact that a small trickle of out-of-state waste would still be allowed to enter South Dakota after the Referendum would not save the Referendum *if* it otherwise had the practical effect of closing off South Dakota's borders to out-of-state waste. *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 618, 628, 98 S.Ct. 2531, 2532, 2537–38, 57 L.Ed.2d 475 (1978) (invalidating a New Jersey statute that prohibited the importation of most, but not all, out-of-state waste); *Waste Sys. Corp.*, 985 F.2d at 1387–88 (holding that ordinances the effect of which was to remove 10,400 annual tons of solid waste at $30 a ton from interstate commerce were discriminatory in practical effect); *Southeast Arkansas Landfill, Inc. v. Arkansas Department of Pollution Control & Ecology, (In re Southeast Arkansas Landfill, Inc.)*, 981 F.2d 372, 373–77 (8th Cir.1992) (holding that an Arkansas statute discriminated against interstate commerce by banning the importation of most out-of-state waste, even though a small amount of out-of-state waste was allowed into Arkansas under the statute).

In addition, *if* the Referendum discriminates against interstate commerce in prac-

---

**8.** Defendants also argued that the Referendum had no practical effect on interstate commerce because Lonetree could not operate in any event in the absence of a valid permit. The Court agrees with this analysis. However, as stated above, the Court discusses the merits of SDDS's commerce clause claim for the sake of completeness and judicial economy should an appellate court disagree with this Court's analysis of the validity of the SDDS permits.

**9.** SDDS estimated that it would dispose of 1.4 million tons of waste annually and that 90 percent of that waste would come from out of state. Ninety percent of 1.4 million is 1,260,000 tons.

tical effect, the fact that the Referendum also precluded SDDS from disposing of *in-state* garbage would not prevent the Referendum from being invalid. *See Fort Gratiot Sanitary Landfill, Inc.,* —— U.S. at ——, 112 S.Ct. at 2024–25 (holding that merely because some in-state, out-of-county waste would also be discriminated against does not render the law valid under the commerce clause); *Southeast Arkansas Landfill, Inc.,* 981 F.2d at 376–77 (finding a statute discriminated against interstate commerce even though it also discriminated against in-state waste from a different waste disposal district).

The facts of this case share many parallels with those in *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). In *Exxon,* following the severe gasoline shortages of 1973, Maryland conducted a study which revealed that, in times of short supply, producers and refiners of petroleum products gave preferential treatment to retail outlets owned by the producers and refiners as opposed to retail outlets operated independently. *Id.* at 121, 98 S.Ct. at 2211. In response to the study, Maryland enacted a law that forbid producers or refiners of petroleum products from operating retail service stations in Maryland. *Id.* at 119, 98 S.Ct. at 2211. Maryland had no in-state producers or refiners of petroleum, so the law operated against only out-of-state concerns. *Id.* at 123, 98 S.Ct. at 2212. The statute continued to allow out-of-state producers and refiners to sell to wholesalers and independent retailers. *Id.*

Exxon and other refiners and producers of petroleum attacked the Maryland statute as being repugnant to the commerce clause. *Id.* at 121–22, 98 S.Ct. at 2211–12. At least three of the plaintiffs which sold petroleum only to self-owned retail outlets claimed that the Maryland statute would cause them to pull entirely out of the Maryland market. *Id.* at 123, 98 S.Ct. at 2212. Because the statute affected only out-of-state businesses, Exxon contended that the statute was discriminatory in practical effect and placed an undue burden on interstate commerce. *Id.* at 125, 98 S.Ct. at 2213–14.

The Court stated that the statute could not be meant to protect in-state producers or refiners, because there were none. *Id.* at 125–26, 98 S.Ct. at 2214. The Court also found that the interstate flow of petroleum into Maryland would likely switch from one interstate source to another interstate source, but that the volume of the interstate flow of petroleum into Maryland would not be reduced. *Id.* at 123, 125–27, 98 S.Ct. at 2212, 2214. The Court stated that the commerce clause protects the entire interstate petroleum industry rather than a single interstate business. *Id.* at 127–28, 98 S.Ct. at 2215. The *Exxon* Court found that the Maryland statute did not discriminate against interstate commerce either facially or in practical effect and thus applied the *Pike* balancing test. *Id.* at 126–28, 98 S.Ct. at 2214–15.

The facts of SDDS's case are similar in many respects to the *Exxon* case. SDDS is a South Dakota corporation, so the claim of economic protectionism for local concerns cannot be levied at the Referendum. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 472–73, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981) (pointing out that Minnesota firms were among the plaintiffs in a suit contending that a Minnesota statute discriminated against interstate commerce). Also, although there are other in-state waste disposers, the Referendum did not benefit them at SDDS's expense. Undeniably the Referendum has had a practical effect on SDDS, but the legislative approval given to the Big Stone disposal facility demonstrates that other firms dealing in interstate waste have not been discriminated against. *See Exxon,* 437 U.S. at 125–28, 98 S.Ct. at 2214–15 (refusing to find discrimination in practical effect where some interstate concerns were burdened but other interstate concerns in the same industry benefitted). The Court concludes that the Referendum does not discriminate against interstate commerce in practical effect.[10] Accordingly, the *Pike* bal-

---

**10.** The fact that the Referendum does not discriminate either directly or in practical effect against interstate commerce distinguishes this case from others where discrimination was present. *See Chemical Waste Management, Inc.,* —— U.S. ——, 112 S.Ct. 2009, 119 L.Ed.2d 121

ancing test will be applied to determine whether the Referendum violates the commerce clause.

## 2. Application of the *Pike* Balancing Test to the Referendum

In order for the Referendum to survive the *Pike* balancing test, the burden rests on SDDS to show that there is no legitimate local purpose served by the Referendum or that the burden imposed on interstate commerce by the Referendum is "clearly excessive" compared to the local benefits accruing from the Referendum. *Minnesota v. Clover Leaf Creamery Corp.*, 449 U.S. at 472, 101 S.Ct. at 728.

■ Defendants assert that the protection of the environment and of South Dakota's natural resources is the legitimate local purpose behind the Referendum. SDDS counters that the state Board of Minerals and Environment (BME), the legislature, and the governor all found the Lonetree facility to be environmentally safe and in the public interest. From this, SDDS deduces that the electorate must have been motivated by improper isolationist purposes when it vetoed S.B. 169 in the Referendum.

There are at least two flaws in SDDS's argument. First, the BME did not properly find that the Lonetree facility was environmentally safe and in the public interest. The absence of these needed findings was the very basis for the South Dakota Supreme Court's invalidation of the permits which the BME issued to SDDS. Therefore, the BME cannot properly be said to have "found" that Lonetree was environmentally safe and in the public interest.

The second flaw in SDDS's argument is that SDDS assumes that the findings of the legislature and the governor were conclusive on the issue of the environmental safety of the Lonetree facility. There was, in fact, ample room for debate on this issue.

Hunter Swanson, the president of SDDS, testified in a public hearing before the BME in August of 1989. His testimony revealed that bales of waste coming into Lonetree would contain some amounts of the toxic substances ammonia, toluene, xylene, and benzene. *See* Administrative Testimony of Hunter Swanson, Docket # 74, Exhibit B, at 111, 122–23. SDDS planned to monitor for toxic substances in bales of waste by subjecting the bales to photoionization. *Id.* at 112–13. This process would detect harmful substances only if the substances escaped into the atmosphere. *Id.*

Mr. Swanson also revealed that bales of waste received at Lonetree would be expected to contain between .002 and .004 by total weight of household waste which, in significant quantities, is regulated as hazardous waste. *Id.* at 146–47. In addition, hazardous waste from small generators might make its way into the waste accepted at Lonetree. *Id.* at 146–47.

In addition, although SDDS had posted a bond with the state to cover costs of monitoring and inspection of the site, SDDS had not tried to project the cost of remediation of the site if that became necessary nor had SDDS offered to post a bond to cover remediation expenses should SDDS be unavailable for clean up. This point may have been a particular consideration to South Dakota voters. A previous corporation had abandoned a site near Igloo, South Dakota, where incinerated sewage ash was being disposed. South Dakota had to assume the entire financial and practical responsibility for cleaning up the 270,000 tons of ash left at the site, reclaiming the site, and continued monitoring of the site. *See* Affidavit of David J. Templeton, Docket No. 64, Exhibit C.

Finally, solid waste disposal sites like the Lonetree facility produce leachate—essentially the "garbage juice" generated by the liquid in the waste being disposed. Leachate poses an environmental hazard and the production of leachate will increase with the volume of the waste and with the amount of moisture that is allowed to reach the waste.

(1992); *Fort Gratiot Sanitary Landfill, Inc.,* —— U.S. ——, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Waste Systems Corp. v. County of Martin Minn.,* 985 F.2d 1381 (8th Cir.1993); and *Southeast Arkansas Landfill, Inc.,* 981 F.2d 372 (8th Cir. 1992).

SDDS resisted the requests of the state to place a hardened clay cap over the site when it was closed to prevent rain and melting snow from reaching the buried waste and producing leachate. In addition, SDDS's proposed method of determining if any leachate had escaped the disposal site was only to test nearby groundwater. Voters may well have thought that this method of detection was akin to closing the barn door after the horse has escaped.

The Court cannot say that the legislature could not have found the Lonetree facility to be environmentally safe in spite of the above risks. But by the same token, the Court cannot say that the electorate's disagreement with the legislature was so irrational as to be evidence of an improper economic motive. There was room for debate on the environmental safety of Lonetree and the electorate was entitled to make the final judgment.

██ SDDS argues that the campaign surrounding the Referendum shows that the electorate voted against S.B. 169 for illegitimate reasons. However, "when considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description, or characterization given it by the legislature or the courts [or the electorate] of the State,' but will determine for itself the practical impact of the law." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (quoting *Lacoste v. Louisiana Dep't of Conservation,* 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)). *See also Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (stating that the professed purpose of a statute is not as important as the real effect the statute has because it will be "the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate commerce.") The Court finds that the protection of the South Dakota environment and the conservation of South Dakota natural resources are legitimate local purposes. The Referendum furthered those purposes.

Finally, SDDS argues that the burden on interstate commerce as a result of the Referendum is "clearly excessive" in light of the local benefits. This argument is based in large part on SDDS's assertion that there are no local benefits resulting from the Referendum. The Court has already rejected this contention. SDDS further argues that the Referendum effectively prevented SDDS from ever operating the Lonetree facility and that this burden on interstate commerce is excessive.

██ Although eliminating one business from interstate commerce has been held under some circumstances to be an excessive burden, the burden a state regulation places on a single business is relevant when "regarded in the context of the overall interstate market." *Pioneer Military Lending, Inc. v. Manning,* 2 F.3d 280, 283 (8th Cir.1993). *See also Exxon,* 437 U.S. at 127–28, 98 S.Ct. at 2215 (stating that "the [commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."). In this case, the Referendum has prevented SDDS from operating Lonetree under the conditions and standards set forth when the legislature passed S.B. 169. However, nothing prevents SDDS from reapplying for another permit and proposing more stringent environmental safeguards. Furthermore, even if SDDS cannot operate Lonetree, the example of the Big Stone waste disposal plant demonstrates that the flow of interstate waste to South Dakota has not been prevented.

The Court concludes that the incidental burden which the Referendum imposed on interstate commerce was not "clearly excessive" in comparison to the local benefits. *See Clover Leaf Creamery Co.,* 449 U.S. at 473, 101 S.Ct. at 728–29 (holding that even if out-of-state plastic producers were burdened relatively more heavily than the Minnesota pulpwood industry, the burden was not "clearly excessive" in view of the ecological benefits which would accrue); *Exxon,* 437 U.S. at 128–29, 98 S.Ct. at 2215 (holding that a state regulation did not impermissibly burden interstate commerce where some interstate refiners would be burdened but others would benefit).

In addition to the foregoing, the Court notes that there was no other realistic alternative for the electorate other than the Ref-

erendum. Once S.B. 169 was passed, Lonetree would be allowed to begin operation absent a referral of S.B. 169. Although it is true that the electorate could have placed an initiated measure on the ballot placing more stringent environmental conditions on S.B. 169, this process would also have taken until November 1992 and would differ from the Referendum in that Lonetree would have been operational in the interim. If Lonetree were accepting its projected 1.4 million tons of waste per year, significant environmental problems could result prior to passage of any initiated measure, thus frustrating the electorate's desire to protect the environment. *See Maine v. Taylor,* 477 U.S. at 151, 106 S.Ct. at 2454 (upholding a plainly discriminatory state regulation under a commerce clause challenge where there was no nondiscriminatory alternative which would protect the environment).

■ The Referendum did not enact an affirmative law prohibiting SDDS from operating the Lonetree disposal facility. Rather, the Referendum in effect "vetoed" the legislature's decision that the Lonetree facility was environmentally safe and in the public interest. Essentially, the Referendum represents the determination of the electorate that Lonetree under the conditions proposed is not in the public interest and is not environmentally safe. South Dakota has the right "to require landfills within its borders to meet health and safety standards." *Southeast Arkansas Landfill, Inc.,* 981 F.2d at 377. It is not for this Court to quarrel with the clear mandate of the electorate where that mandate passes constitutional muster.

The fact that the Lonetree facility was the only waste disposal site large enough *at the time* to require legislative approval and therefore subject to the referendum process is not alone enough to invalidate the Referendum. Certainly Lonetree should not have been treated discriminatorily because it was the only waste facility proposing to operate on a large scale. But neither should Lonetree's unique status have insulated SDDS from the electorate's desire to ensure that the facility was environmentally safe. The electorate's exercise of the referendum process in this case was precisely the type of

issue for which referendums were designed. *See Eastlake,* 426 U.S. at 673, 96 S.Ct. at 2362. There was no violation of the commerce clause.

## D. SDDS's Equal Protection Claim

Both SDDS and defendants agree that whether the Referendum is in violation of the equal protection clause of the 14th amendment is to be determined by applying the "rational basis" test because the Referendum is an economic measure which does not involve suspect classifications or fundamental rights. *See Kadrmas v. Dickinson Pub. Schools,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *MSM Farms, Inc. v. Spire,* 927 F.2d 330, 332 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991).

■ Under the rational basis test, a state regulation is presumed to be constitutional and will be invalidated only if the classification created by the regulation bears no rational relationship to a legitimate state interest. *Kadrmas,* 487 U.S. at 462, 108 S.Ct. at 2490; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 461–63, 101 S.Ct. at 722–23; *Dukes,* 427 U.S. at 303, 96 S.Ct. at 2516–17; *MSM Farms, Inc.,* 927 F.2d at 332. A corporation is a "person" within the purview of the equal protection clause. *MSM Farms, Inc.,* 927 F.2d at 332. The burden of proving the state regulation to be unconstitutional rests on the party challenging the regulation. *Kadrmas,* 487 U.S. at 463, 465, 108 S.Ct. at 2490–91.

■ Defendants contend that the legitimate state purpose furthered by the Referendum is the protection of South Dakota's environment and the conservation of South Dakota natural resources. SDDS does not dispute that these are legitimate state interests. Therefore, the issue before the Court centers on whether the classification created by the Referendum "rests on grounds wholly irrelevant to the achievement of the State's objective[s]." *Kadrmas,* 487 U.S. at 462, 108 S.Ct. at 2490 (quoting *McGowan v. Mary-*

*land,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393] (1961)).

It is useful to note at the outset that the Referendum did not create a classification in itself. Rather, the Lonetree project was before the South Dakota electorate by virtue of the Initiated Measure's requirement that SDDS obtain legislative approval. Once legislative approval became mandated, the door was opened to the referendum process. *See* S.D.Const. art. III, §§ 1, 22; SDCL 2–1–3, 2–14–16.

The classification between waste disposal facilities handling over 200,000 tons of waste per year and waste disposal facilities handling lesser amounts is the classification created by the Initiated Measure. The constitutionality of the Initiated Measure under the equal protection clause has already been decided by Judge Zinter in *SDDS III.* However, it was the classification contained in the Initiated Measure which made it possible for S.B. 169 to be submitted to the referendum process. Therefore, the classification of the Initiated Measure is, to some degree, also the classification of the Referendum, even though the Referendum dealt with a single waste disposal facility.

SDDS argues that the Referendum bears no rational relationship to the protection of South Dakota's environment because the BME and the legislature already had determined that the Lonetree facility was environmentally safe. This is the same argument raised by SDDS in the above commerce clause analysis. It is rejected here for the same reasons. First, the BME did not "find" that the Lonetree facility was environmentally safe. Second, even if the legislature did find Lonetree to be safe, there was evidence of many environmental risks associated with Lonetree which the electorate could have found significant. Specifically, there were risks of leachate formation and leakage into ground water, risks of hazardous waste entering Lonetree undetected, and the risk of cleanup becoming necessary with its attendant cost to the taxpayers.

SDDS contends further that the Referendum bears no rational relationship to environmental hazards because the waste SDDS proposed to dispose of at Lonetree was much less environmentally dangerous than that disposed of at the Big Stone Power Plant. The Court notes initially that SDDS's argument assumes that the electorate's disagreement with Lonetree stemmed from the *type* of waste being disposed of there. The Court finds it just as likely that the electorate's disagreement may have stemmed from the *manner of disposal* proposed by SDDS rather than from the type of waste.

However, the issue before this Court is not whether the Referendum in fact ensured environmental safety. Rather, the issue is whether there was evidence before the electorate from which the electorate reasonably could have believed that the classification would further the purpose of environmental safety. *Clover Leaf Creamery, Co.,* 449 U.S. at 464, 101 S.Ct. at 724; *MSM Farms, Inc.,* 927 F.2d at 333. Under this standard, the Court concludes that there was evidence before the electorate in the form of the public administrative hearings as well as other sources of information about Lonetree from which the electorate could reasonably have believed that the Referendum would further the protection of South Dakota's environment. The fact that the electorate chose not to subject the legislative approval granted to the Big Stone Power Plant to the referendum process does not invalidate the Referendum against Lonetree. *See Dukes,* 427 U.S. at 303–05, 96 S.Ct. at 2517–18 (holding that a state may only partly ameliorate a perceived evil at one time and that the failure of a regulation to eliminate all of an evil at one step does not make the regulatory classification irrational).

Finally, SDDS argues that defendants have admitted that Lonetree would have been environmentally safe and that defendants are bound by that admission. SDDS relies on paragraphs 18 and 19 of its answers to interrogatories and requests for admissions. Defendants' answers to these numbered requests are *not* unqualified admissions. Furthermore, the answer to paragraph 19 refers back to an answer defendants gave at paragraph 17 and SDDS did not provide the Court with defendants' answer to paragraph 17. Inasmuch as it is SDDS's burden to show the unconstitutionali-

ty of the Referendum under the equal protection clause, the Court holds that SDDS has failed to provide the proof necessary to sustain its motion or to counter defendants' motion. Accordingly, SDDS's equal protection claim fails.

## CONCLUSION

SDDS has never had a valid permit to operate its proposed Lonetree facility. This fact leads to the conclusion that the Referendum did not violate SDDS's substantive or procedural due process rights because SDDS had no constitutionally protected property interest in operating Lonetree. Furthermore, the lack of a valid permit also leads to the conclusion that the Referendum did not violate SDDS's right to equal protection or its rights under the interstate commerce clause because the Referendum had no practical effect—SDDS was not capable of operating Lonetree in any event. Finally, even if the Referendum had some practical effect, the Court concludes that SDDS's commerce clause and equal protection claims fail on their merits.

Based on the foregoing, defendants' motion for summary judgment is granted and SDDS's cross-motion for summary judgment is denied. An order shall issue this same day.